In the Matter of ISRAEL KESSELBRENNER, as Director of the Manhattan State Hospital, Appellant, *v.* ANONYMOUS, an Allegedly Dangerously Mentally Ill Patient, Respondent.

Second Department, July 19, 1972.

*Louis J. Lefkowitz, Attorney-General* (*Samuel A. Hirshowitz* and *Brenda Soloff* of counsel), for appellant.

*Simon Rosenzweig, Director of Mental Health Information Service for the First Judicial Department* (*June A. Resnick* and *Edward M. Chikofsky* of counsel), for respondent.

*Malachy T. Mahon, Chairman, Special Committee on Commitment Procedures and Law relating to Incompetents, Association of Bar of City of New York,* in support of respondent.

BRENNAN, J. The basic question presented involves the constitutionality of section 85 of the Mental Hygiene Law[1], which provides, insofar as pertinent, for the mandatory transfer of a civilly committed patient in a State hospital to Matteawan State Hospital following a determination that he is dangerously mentally ill.[2]

In essence, section 85 provides that when the director of a State hospital ascertains that a mentally ill patient "has committed or is liable to commit an act or acts which if committed by a sane person would constitute homicide or felonious assault, or is so dangerously mentally ill that his presence in such a hospital is dangerous to the safety of other patients therein, the officers or employees thereof, or to the community," he must, on order of the Commissioner of Mental Hygiene, forthwith apply to a designated court for the appointment of two physicians, unconnected with the hospital, to make a personal examination of the patient. The court must designate the doctors, who, if they find that the patient meets either of the standards set forth above, must so certify (Mental Hygiene Law, § 85, subd. 1).

The certificate is required to be delivered to the director who must annex it to a petition for an order placing the patient in Matteawan State Hospital. Written notice of the petition and a copy of the petition must be served upon the patient and the Mental Health Information Service and, additionally, upon the spouse, a parent or other nearest relative if in the State and, if not, upon any known friend in the State. There must be at least five days' notice of the return date of the application (§ 85, subd. 2).

If no demand for a hearing is made by or on behalf of the patient, the Judge to whom the application is made may determine the issue of dangerous mental illness on the return date and, if satisfied that the allegation is correct, may immediately issue an order placing the patient in Matteawan (§ 85,

---

1. The Mental Hygiene Law was repealed and a new Mental Hygiene Law was enacted, effective January 1, 1973, by chapters 251 and 253 of the Laws of 1972. Under the savings clause of the new statute (§ 91.03) "nothing contained in this chapter * * * shall affect or impair the validity of any act done or right accruing, accrued or acquired, or any order, judgment or status established prior to the enactment of this chapter."

2. The appeal was transferred here by the Appellate Division, First Department.

subd. 3). If a hearing is demanded, or if the Judge upon his motion orders a hearing, it must be held within five days, on notice to interested parties. The patient may be represented by counsel. A written decision must be filed. If the person is found to be dangerously mentally ill, " the judge shall forthwith issue his order hospitalizing him in the Matteawan state hospital for a period not to exceed six months from the date of such order." The patient must be retained at Matteawan until he is no longer dangerous to safety or until the expiration of the period of hospitalization ordered or of the period of authorized retention, whichever is first (§ 85, subd. 4).

If the director of Matteawan determines that a patient admitted under section 85 continues to be dangerous, he must apply for an order authorizing further continued retention. The provisions of sections 73 and 74 of the Mental Hygiene Law govern the retention application, " except that the question to be determined thereon shall be the continued dangerous mental illness of such patient," and if it is determined that he is no longer dangerously mentally ill the court may order his discharge or his transfer to a hospital in the Department of Mental Hygiene (§ 85, subd. 4-a). Moreover, " orders for hospitalization in Matteawan state hospital pursuant to this section shall not be deemed as or received in any court in evidence of commission of a crime by the person so ordered hospitalized, nor shall such order for hospitalization be deemed or considered as punishment for a crime " (§ 85, subd. 5).

The respondent was an involuntary civil mentally ill patient at Manhattan State Hospital from May, 1969 — with short interruptions occasioned by his several escapes — until the hearing held at Special Term on September 30, 1971. On August 5, 1971 the appellant, the director of Manhattan State Hospital, made an application pursuant to subdivision 1 of section 85 of the Mental Hygiene Law for an examination of the respondent by two examining physicians, alleging that the respondent was dangerously mentally ill and detailing the supportive facts. The two examining physicians, after reviewing the respondent's history and record, and after examining him, certified that he was " so dangerously mentally ill that (his) presence in a hospital in the Department of Mental Hygiene is dangerous to the safety of other patients therein, the officers or employees thereof, or to the community." The respondent was notified of his right to a hearing. A hearing was held at the request of Mental Health Information Service. The respondent was represented

by counsel at the hearing. Apparently, no request was made for a jury trial of the issues.

Following the statutory hearing, the Special Term found "beyond a reasonable doubt that, due to his mental illness * * * [the respondent] committed several assaults and assaultive acts while in Manhattan State, including a very serious assault upon an attendant, thus endangering the safety of other patients and employees of the hospital." Accordingly, the Special Term determined that the respondent was dangerously mentally ill within the meaning of the statute. There is ample evidence to sustain this finding and no appellate issue is raised in this respect. The Special Term nonetheless denied the petitioner's application insofar as it requested that the respondent be committed to Matteawan State Hospital as required by subdivision 4 of section 85 of the Mental Hygiene Law, concluding that such a commitment would be a violation of the respondent's constitutional rights to equal protection of the laws and substantive due process. The appeal, as limited by the appellant's notice of appeal and his brief, is from so much of the Special Term's order as refused to direct such commitment.

The appellant argues on appeal that the requirement of subdivision 4 of section 85 of the Mental Hygiene Law that upon a finding that a patient is dangerously mentally ill " the judge shall forthwith issue his order hospitalizing him in the Matteawan state hospital for a period not to exceed six months from the date of such order " does not deny the respondent the constitutional right of either equal protection of the laws or due process of law.

We agree with the appellant's contention that the recent determination of the Supreme Court of the United States in *Baxstrom* v. *Herold* (383 U. S. 107) points to the conclusion here reached on the constitutional validity of section 85 of the Mental Hygiene Law and recognizes that commitment thereunder to Matteawan State Hospital of an indigent person entitled to civil status is constitutional where such person is dangerously mentally ill and is afforded procedural due process as to (1) the determination that he is dangerously mentally ill and (2) the right to periodic review of his status.

In *Baxstrom* (*supra*) the Supreme Court considered the constitutional validity of the statutory procedure under which the indigent petitioner, Baxstrom, was committed to a mental institution at the expiration of his criminal sentence in a New York State prison. During his term he was certified as insane by a

prison physician and was transferred from the prison to Dannemora State Hospital, an institution under the jurisdiction and control of the New York Department of Correction, used for the purpose of confining and caring for male prisoners declared mentally ill while serving a criminal sentence. Thereafter, the director of Dannemora State Hospital filed a petition stating that Baxstrom's penal term was about to terminate and requesting that he be civilly committed pursuant to the then extant section 384 of the Correction Law. On the date when Baxstrom's penal sentence expired, custody over him shifted from the Department of Correction to the Department of Mental Hygiene, but he was thereafter retained at Dannemora. The Supreme Court held that Baxstrom had been denied equal protection of the laws by the statutory procedure (Correction Law, § 384) under which he was civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York. The court held that Baxstrom had further been denied equal protection of the laws by his civil commitment to an institution maintained by the Department of Correction beyond the expiration of his prison term without a judicial determination that he was dangerously mentally ill such as that afforded to all so committed, except those, like Baxstrom, nearing the expiration of a penal sentence.

The Supreme Court recognized that classification of mentally ill persons as either insane or dangerously insane may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given. However, in the setting of *Baxstrom* the court stated that "it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all*" (p. 111 [emphasis in original]). The court stated that there was no basis for distinguishing the commitment of a person who was nearing the end of his penal term from all over civil commitments.

In sum, the Supreme Court stated (p. 115): "In order to accord to petitioner the equal protection of the laws, he was and is entitled to a review of the determination as to his sanity in conformity with proceedings granted all others civilly committed under § 74 of the New York Mental Hygiene Law. *He is also entitled to a hearing under the procedure granted all others by § 85 of the New York Mental Hygiene Law to determine whether he is so dangerously mentally ill that he must remain in a hospital maintained by the Department of Correction*" (emphasis added).

It is clear from the *Baxstrom* decision that there not only is a distinction between Department of Correction hospitals and Department of Mental Hygiene hospitals, but also a distinction in the classification of mentally ill persons as either insane or dangerously mentally insane, for the purpose of determination as to the type of custodial or medical care to be given.

While perhaps *Baxstrom* was primarily concerned with the question of due process, of significance in the case at bar is the fact that *Baxstrom* tacitly approved and recognized the constitutional validity of the procedure prescribed by section 85 of the Mental Hygiene Law. It follows, and we so hold, that it is constitutionally proper for the State to transfer and to confine dangerously mentally ill civil patients in Matteawan State Hospital, a hospital under the jurisdiction of the Department of Correction, providing the patient is afforded procedural due process as to classification and periodic review thereafter. The respondent on the instant appeal was afforded all of the procedural due process required by *Baxstrom* for commitment under section 85 of the Mental Hygiene Law. The procedure outlined in the statute was meticulously followed. Undoubtedly, the respondent would have been entitled to a jury trial of the issues presented (cf. *People* v. *Lally,* 19 N Y 2d 27, 34–35). He did not request a jury trial.

In *Lally* (*supra*), the Court of Appeals held section 454 of the former Code of Criminal Procedure to be constitutional. In outlining the procedure to be followed on remission of the case, the Court of Appeals inferentially recognized the constitutionality of section 85 of the Mental Hygiene Law, with which we are concerned on the present appeal. In substance, section 454 of the former Code of Criminal Procedure provided that in a criminal case, if the defendant pleads insanity and the jury acquits him on that ground, the court must order him committed to the custody of the State Commissioner of Mental Hygiene, to be placed in an appropriate institution in the Mental Hygiene or Correction Department. The Court of Appeals remitted the case to the Criminal Term for a hearing to be held pursuant to subdivisions (2), (3) and (5) of section 454. Insofar as pertinent the Court of Appeals stated (pp. 34–35): " The issues there to be tried are whether appellant may be discharged or released without danger to himself or to others, and, if that question be answered in the negative, whether he is so dangerously mentally ill as to require hospitalization in Matteawan State Hospital. To provide defendant with protection equal to that of other persons under the New York State statutes as to

adjudications of mental incompetency we may and do read into subdivision (5) (see *People ex rel. Morriale* v. *Branham,* 291 N. Y. 312, 317; *People* v. *Finkelstein,* 9 N Y 2d 342) a provision for a jury trial of these issues, if appellant so requests. If it be determined as a result of the hearing that defendant while not dangerous to himself or others is mentally incompetent and in need of hospitalization the court shall recommit defendant to the State Commissioner of Mental Hygiene for confinement in a State civil hospital for the insane. He shall in that event not be confined in Matteawan,

" To comply with the spirit if not the express language of the *Baxstrom* decision (*supra*) we hold that, before there can be any commitment to Matteawan State Hospital for the insane under section 454 procedures, a person must be accorded all the protections of sections 74 and 85 of the Mental Hygiene Law including a jury trial, if requested." (Cf. *United States ex rel. Schuster* v. *Herold,* 410 F. 2d 1071 [involving transfer of prisoner]; *United States ex rel. Daniels* v. *Johnston,* 328 F. Supp. 100, 116 [involving prisoner incompetent to stand trial].)

We have considered the points relied upon at the Special Term and find the same to be insubstantial. We attach no significance to the omission of the word " treatment " in the mandate to the Department of Correction (Correction Law, § 400, subd. 1) to maintain hospitals for the mentally ill " solely for the purpose of *holding in custody and caring* for such mentally ill persons " (emphasis added). In our opinion, the word " care " as used therein includes and imports the " treatment " of such persons. In this connection, the Special Term, in establishing a distinction between confinement at Matteawan and State civil mental hospitals, referred to the book published in 1968 by the Special Committee of the Association of the Bar of the City of New York in co-operation with the Fordham Law School. This publication, containing information on Matteawan State Hospital, was filed with this court and is based upon annual reports of the director of Matteawan State Hospital to the year 1966. Through the courtesy of the Mental Health Information Service, Second Department, the annual reports of Matteawan for the period 1966 through 1971 have been furnished to this court. The report for the period April 1, 1970 to March 31, 1971 shows the composition of the resident staff; the movements of patients, including the number " treated "; the types of commitments, indicating 17 commitments under section 85 of the Mental Hygiene Law for the period 1969–1970 and 13 for the

period 1970–1971; and dispositions of patients. It is noteworthy that the resident staff at Matteawan State Hospital includes, in addition to the director, 13 psychiatrists of varying grades, four psychologists of varying grades, and other related medical personnel and services. It is apparent from the foregoing that Matteawan State Hospital is adequately staffed to provide the necessary " treatment and care " commensurate with the needs of civil patients transferred there pursuant to section 85 of the Mental Hygiene Law.

In this light, we find unpersuasive the Special Term's assertion that Matteawan gives primacy to maximum security rather than treatment. We agree with the appellant's contention that the *Baxstrom* decision imports that the Legislature may provide that a patient who manifests dangerous proclivities requiring maximum security and constant supervision may be placed in an institution, even though under the jurisdiction of the Department of Correction, so long as such placement complies with procedural due process. Such confinement may endure until the court determines that the patient is no longer dangerously mentally ill, at which time the court may order transfer of the patient to another hospital in the Department of Mental Hygiene (Mental Hygiene Law, § 85, subd. 4-a). Respecting the place of confinement, it is our view that a dangerously mentally ill civil patient who has committed repeated felonious assaults upon fellow patients and personnel while hospitalized in a civil mental hospital is in no different category than a person of doubtful mental capacity, charged criminally with felonious assault, who has been confined at Matteawan State Hospital pending a determination as to whether he is mentally competent to stand trial.

Additionally, we reject the contention that the differences in the respective regulations and procedures relating to visiting privileges and communication are tantamount to an infringement of the respondent's constitutional right of equal protection of the laws. We recognize the differences in the internal operation of hospitals under the jurisdiction of the Departments of Correction and Mental Hygiene. However, we believe that the more restrictive regulations governing the former, as in the case of section 85 transfers, are proper and warranted by the need to protect ordinary civil mental patients from others in the same class who are dangerously mentally ill.

Similarly, we find no weight to the respondent's argument — presented without evidentiary foundation — that, since it may be

inferred that the proportion of patients in State hospitals who are poor and disadvantaged is higher than in other types of mental hospitals, transfers under section 85 necessarily fall with greater impact on the poor and that the practical effect of such a statutory provision constitutes a denial of equal protection of the laws. Suffice to note in this regard that all mental hospitals, public and private, are under the control of the Commissioner of Mental Hygiene (Mental Hygiene Law, §§ 7, 10-a, 71 [subd. 3], 88, 424 [subd. 2]). Thus, when section 85 alludes to dangerously mentally ill patients, it contemplates all such patients, rich and poor, and regardless of whether confined in a public or private mental hospital. Further, insofar as due process is concerned, all patients, including those confined in Matteawan State Hospital, are given the aid of the Mental Health Information Service. Parenthetically, the Legislature in its recent enactment of the new Mental Hygiene Law (L. 1972, ch. 251) enacted the counterpart of section 85 and restated the procedure governing the commitment and transfer of certain dangerous patients of any hospital in the department (new Mental Hygiene Law, §§ 29.11, 29.13) '' to an appropriate institution in the state department of correction '' (§ 29.13, subd. [d]). It is significant on the question respecting the place of confinement that the new statute, effective January 1, 1973 (L. 1972, ch. 253, amdg. new § 91.05) — despite previous recommendations of the Special Committee of the New York City Bar Association (2d Rep. Spec. Comm. on Commitment Procedures and the Law Relating to Incompetents, Assn. of Bar of City of N. Y., Mental Illness, Due Process and the Criminal Defendant [Fordham Univ. Press, 1968]) — again provides for the commitment of certain dangerous patients '' to an appropriate institution in the state department of correction '' (§ 29.13, subd. [d]).

Finally, we perceive of no infringement of the respondent's constitutional right to equal protection of the laws or due process. We conclude that any disparity in the regulations concerning the internal operation of mental hospitals within the jurisdiction of the Departments of Correction and Mental Hygiene is not a matter of judicial concern, but lies rather within the peculiar administrative competence of the executive and legislative branches of State government.

The order should be reversed insofar as appealed from, on the law, without costs, and the application for commitment of

the respondent should be granted to the extent of committing him to an appropriate institution in the State Department of Correction.

SHAPIRO, J. (dissenting). The petitioner, Dr. Israel Kesselbrenner, is the director of the Kirby-Manhattan Psychiatric Hospital, a State mental hospital under the jurisdiction of the Department of Mental Hygiene. The respondent is currently an inmate at that hospital. Acting under section 85 of the Mental Hygiene Law, Dr. Kesselbrenner requested the Special Term to order the respondent transferred to and committed in Matteawan State Hospital (Matteawan), a facility for the custody of the criminally insane *under the jurisdiction of the Department of Correction,* on the ground that his continued presence in a hospital under the jurisdiction of the Department of Mental Hygiene is dangerous not only to the safety of other patients therein but also to the officers and employees thereof or to the community.

Section 85 of the Mental Hygiene Law, *inter alia,* provides that when the director of a State mental hospital ascertains that a patient has committed acts which, if committed by a sane person, would constitute felonious assault, or is so dangerously mentally ill that his presence in the hospital is dangerous to the safety of other patients or the officers or employees thereof or to the community, he must, on order of the Commissioner of Mental Hygiene, apply to the court for the appointment of two physicians unconnected with the hospital to examine the patient. Upon designation by the court the two doctors, after examination of the patient, are required to certify whether he comes within any of the categories above set forth. If they so find, the director must annex their certification to a petition for an order committing the patient to Matteawan.

Section 85 safeguards the due process rights of the patient by requiring that a copy of the petition be served upon him and his spouse, parent or other nearest relative in the State and also upon the Mental Health Information Service. The papers must contain a statement that the patient has a right to demand a hearing. If a hearing is demanded or if the court, on its own motion, orders a hearing, it must be held within five days, on notice to all the interested parties, and the court is required to file a written decision evidencing its determination.

If the court finds the patient to be " dangerously mentally ill " it " shall forthwith " issue its " order hospitalizing him in the Matteawan state hospital for a period not to exceed six

months from the date of such order'' (§ 85, subd. 4).[1]  The patient must then be retained at Matteawan State Hospital until he is no longer dangerous or until the period of hospitalization or the period of authorized retention expires, whichever is first.  If the director of Matteawan determines that a patient admitted pursuant to section 85 continues to be dangerous he must apply to the court for an order authorizing further retention.  The court must then determine if the patient is still dangerously mentally ill.  If he is, it must order his continued retention at Matteawan.  If not, the court may order the patient's discharge or his transfer to a hospital under the jurisdiction of the Department of Mental Hygiene.

The petitioner's application for an order of commitment of the respondent to Matteawan had annexed to it a statement by a social worker at Kirby-Manhattan Hospital listing a total of nine actions by the patient from July 4, 1970 to April 12, 1971 which were the basis for the application for appointment of two doctors to ascertain if the respondent was dangerously mentally ill.

At the hearing the two independent psychiatrists named by the court testified.  One stated that the respondent '' is severely ill and represents a danger to physicians, the personnel of the hospital '' and should be kept under '' maximal security '' in a place '' where he cannot assault other patients in the facility '' and where he would be '' observed all the time without access to patients, without access to instruments of assault.''  The other doctor testified that she also found the patient to be '' dangerously mentally ill '' at the time of the examination but said she could not predict whether the patient would continue to be dangerous.

---

1. On January 1, 1973 a recodification of the Mental Hygiene Law (L. 1972, chs. 251, 253) will become effective. Section 85 of the present law, altered in some respects, is section 29.13 of the recodified law.  One change made in the new section 29.13 is that the provisions requiring transfer of a "dangerously mentally ill" patient, now called "the allegedly dangerous patient", were altered to mandate that a "patient" (defined as "a person admitted to a hospital or school in the department and retained therein on an involuntary basis pursuant to the provisions of this chapter") who is found to be dangerous shall be committed "to an appropriate institution in the state department of correction" instead of to Matteawan.  This change in the statute would in any event in no way alter the issue now before this court, which, simply stated, is whether a statutory requirement that a court may transfer any civil patient in a State mental hospital to a Department of Correction facility maintained by that Department "solely for the purpose of holding in custody and caring for such mentally ill persons held under any other than a civil process" (Correction Law, § 400, subd. 1) is constitutional.

At the close of the hearing, counsel for the respondent patient moved to dismiss the petition on the ground that the petitioner had failed to prove that the respondent could not be managed in a civil hospital.

Mr. Justice ARNOLD L. FEIN, although agreeing that the petitioner had established that the respondent was dangerously mentally ill (as required by section 85 of the Mental Hygiene Law), nevertheless, in a well-reasoned opinion, decided that " the statutory mandate requiring the judge to order the transfer of a dangerously mentally ill civil patient to Matteawan violates the equal protection clauses of the federal and state Constitutions " and that it also " denies respondent substantive due process."

Thus the basic question to be determined on this appeal[2] is whether the provision of section 85 requiring the hearing court to transfer any civil patient found to be dangerously mentally ill to Matteawan " solely for the purpose of holding in custody and caring *for such mentally ill persons held under any other than a civil process* " (Correction Law, § 400, subd. 1 [emphasis added]) is constitutional.[3]

We start with the underlying statutes which make it evident that " there are vast differences between confinement in Matteawan, which is operated by the Department of Correction, and confinement in a civil hospital operated by the Department of Mental Hygiene " (*Neely* v. *Hogan,* 62 Misc 2d 1056, 1060).[4]

---

2. The appeal was transferred here by the Appellate Division, First Judicial Department.

3. Subdivision 1 of section 400 of the Correction Law does state that the Department of Correction shall also provide custody and care in its hospitals to persons placed therein or transferred thereto by the Commissioner of Mental Hygiene and for persons committed thereto under section 85 of the Mental Hygiene Law, but all the other groups specified in subdivision 1 of section 400 are the kinds normally characterized as " criminally insane".

4. Subdivision 1 of section 400 of the Correction Law declares that the Department of Correction shall have the jurisdiction and control of State hospitals for the mentally ill maintained by it for use " solely for the purpose of *holding in custody and caring* for such mentally ill persons held under any other than a civil process," etc., though such hospitals " shall be subject to visitation and inspection of the head of the department of mental hygiene" (emphasis added). Section 11 of the Mental Hygiene Law grants the Department of Mental Hygiene the professional jurisdiction, supervision and control of the State hospitals, as now or hereafter established, "*for the care and treatment* of the mentally ill, but not including Matteawan nor Dannemora state hospitals" where the powers of the Department are " limited to aiding the head of the department of correction in exercising his powers and duties" (emphasis added). The recodified Mental Hygiene Law provides in subdivision

In *Covington* v. *Harris* (419 F. 2d 617, 622–623), the Court of Appeals of the District of Columbia, per Chief Judge BAZELON, in discussing the propriety of committing a civil patient to the John Howard Pavilion of Saint Elizabeth Hospital, a maximum security facility, said: "It appears that John Howard houses principally the so-called 'criminally insane'. Such facilities have, in the past, notoriously rivalled maximum security prisons in the pervasiveness of their restraint upon liberty and the totality of their impositions upon dignity. The predecessor to John Howard Pavilion at Saint Elizabeths was described to this court as 'a place for the confinement of the violent, criminal, hopeless insane, instead of * * * a place designed and operated for the treatment of the mentally ill.' [Miller v. Overholzer * * * 92 U. S. App. D. C. at 116, 206 F. 2d at 419. In Baxstrom v. Herold, 383 U. S. 107, 113 * * * the Supreme Court took note of the 'striking' dissimilarities between Dannemora — the New York hospital for the 'criminally insane' — and New York's 'civil' hospitals.] * * *

"Thus, there is reason to believe that confinement in John Howard is not normally contemplated for civilly committed patients and entails extraordinary deprivations of liberty and dignity which make it, in effect, more penitentiary than mental hospital, even if it also provides some treatment."[5]

In a footnote to a portion of the foregoing quotation Judge BAZELON says of the term "criminally insane" (p. 622): "This designation refers to persons who have not been civilly committed but are rather confined as a result of criminal proceedings, either because they are incompetent to stand trial for pending charges or because they have been found not guilty by reason of insanity of a criminal offense."

The observation made in *Covington* is particularly applicable to the situation here. Subdivision 1 of section 7 of the Mental Hygiene Law provides that "the department of mental hygiene is charged with the execution of the laws relating *to the custody, care and treatment* of the mentally ill," while subdivision 1 of section 400 of the Correction Law provides that the Department of Correction shall "maintain one or more hospitals, to

(a) of section 7.15 that "there shall be in the [Mental Hygiene] department the hospitals named below for the care and treatment of the mentally disabled". The hospitals listed do not include any Department of Correction facilities.

5. Statistics obtained by us from the New York State Mental Health Information Service show that for the year 1969/1970 only 17 of the 257 patients committed to Matteawan were civilly committed there pursuant to section 85 of the Mental Hygiene Law and in the fiscal year 1970/1971 the corresponding figures were 13 of 278, an even greater disproportion.

be used solely *for the purpose of holding in custody and caring for such mentally ill persons* '' (emphasis added). The statutes thus clearly draw the distinction between the duties and responsibilities of the two departments.[6] Thus, in the case of the Department of Mental Hygiene, it is not only charged with the custody and care of its patients but also with their '' treatment '', i.e., *their cure,* whereas, in the case of the Department of Correction, its duty is merely to hold in custody and care; there is no mention of '' treatment ''. The distinction, it seems to me, is vital and sustains the determination of the Special Term that committing a patient — such as the respondent — who has not been convicted of — or charged with — the commission of a crime — to an institution — not for treatment — but merely for custody *and the care incidental thereto* is violative of the civil patient's constitutional rights.

Another important distinction between the two kinds of confinement is that patients committed to Matteawan are retained by the court order for the period fixed in the order and they may not be released even temporarily for such therapeutic purposes as home visits, except with the prior approval of the court.[7]

---

6. Subdivision 6 of section 2 of the Mental Hygiene Law defines " care and treatment" as " medical care, surgical attendance, nursing and medications as well as food, clothing and maintenance, furnished to a patient ". In the recodified Mental Hygiene Law subdivision 6 of section 2 is omitted. The memorandum of the Joint Legislative Committee on Mental and Physical Handicap on the recodification, the purpose of which memorandum is stated therein " to outline generally the basic provisions of the bill for recodification of the Mental Hygiene Law   *   *   *   and to point out significant changes from existing law," gives no reason for the omission of that definition, even though the term is used twice in subdivision (a) of section 7.15 of the recodified law with the complete listing of departmental hospitals for the care and treatment of the mentally disabled. We must assume that the omission was due to the legislative view that this meaning of the term as it was defined in the present law is so self-evident as to require no specific definition in the new law. The Correction Law contains no definition of what is meant by " custody and caring for such mentally ill persons."

7. The more modern view now being taken by the Legislature of the mentally ill is reflected by section 409 of the Correction Law. It authorizes the director of Matteawan State Hospital to discharge (but not to temporarily release) any inmate '' not a prisoner '' although he is mentally ill who, in the director's opinion, is reasonably safe to be at large or is recovered. This section, though it deals primarily with *discharge* by the director of Matteawan of patients other than prisoners, reflects an attitude well summed up by the United States Court of Appeals for the Second Circuit when it said: " We have, thankfully, come a long way from the days when ignorance induced fear of the mentally ill. As great strides in psychiatric knowledge have been paralleled by evolving concepts of due process, humane procedures for the commitment and treatment

Other provisions of the two applicable statutes further emphasize the differences between the handling of patients confined in Matteawan and those in State mental hospitals administered by the Department of Mental Hygiene. Section 413 of the Correction Law provides: ''No person not authorized by law or by written permission from the commissioner of correction shall visit the Matteawan state hospital, or communicate with any patient therein without the consent of the superintendent; nor, without such consent, shall any person bring into or convey out of the Matteawan state hospital any letter or writing to or from any patient; nor shall any letter or writing be delivered to a patient, or if written by a patient be sent from the Matteawan state hospital until the same shall have been examined and read by the superintendent or some other officer of the hospital duly authorized by the superintendent.''[8]

The Mental Hygiene Law has no provisions requiring that visitors to patients have the *written* consent of the Commissioner of Mental Hygiene or in fact any consent. Section 15 of that law[9] deals with correspondence of patients and provides: '' The commissioner shall make such regulations in regard to the correspondence of the patients in institutions and hospitals as in his judgment will promote their interests, and it shall be the duty of the proper authorities of each institution and hospital to comply with and enforce such rules and regulations. All

---

of the mentally ill have replaced snake pits and witch hunts. The time has long since passed when a mere charge that one was 'possessed by demons' would automatically result in banishment for insanity '' (*United States ex rel. Schuster* v. *Herold*, 410 F. 2d 1071, 1073).

8. Only communications addressed by a patient to the County Judge or District Attorney of the county from which he was sentenced (a provision obviously inapplicable to civil patients committed to Matteawan under section 85 of the Mental Hygiene Law) must be forwarded to their destination by the Superintendent after examination by him.

9. Section 15 is replaced by section 15.05 of the recodified Mental Hygiene Law, which provides:

'' § 15.05 Communications and visits.

'' (a) Each patient in a facility shall have the right to communicate freely and privately with persons outside the facility as frequently as he wishes, subject to regulations of the commissioner designed to assure the safety and welfare of patients and to avoid serious harassment to others. Correspondence addressed to public officials, attorneys, clergymen, and to the mental health information service shall be unrestricted and shall be sent along promptly without being opened.

'' (b) The commissioner by regulation shall establish guidelines to insure that patients at facilities have full opportunity for conducting correspondence, have reasonable access to telephones, and have frequent and convenient opportunities to meet with visitors.''

such patients shall be allowed to correspond without restriction with any public official and with the mental health information service.''

The regulations issued by the two departments covering visits to inmates also demonstrate the difference between Matteawan and Department of Mental Hygiene State hospitals. Section 53.4 of title 7 of the Codes, Rules and Regulations of the State of New York, governing the procedure for visitors to Department of Correction facilities, including Matteawan, provides that all visitors, with certain specified exceptions, must be fingerprinted at the institution at the time of the first visit and all nonmembers of the immediate family as well as friends must secure written permission to visit from the *warden* at least 10 days before the date of the desired first visit. Contrariwise, part 57 of the regulations of the Department of Mental Hygiene (14 NYCRR Part 57) allows visits to patients in State hospitals by any relative and by any other person authorized by the nearest of kin. In addition, the hospital director may permit visits of persons other than relatives or persons authorized by relatives when, in his discretion, such visits are in the interest of the patient or serve the cause of justice.

The fingerprinting requirement for all friends (not relatives) who visit patients at Matteawan is presently in effect according to the regulations currently governing visiting, correspondence and packages, issued with respect to Matteawan (see Department of Correction Release No. 183, revised Feb. 2, 1970). In practice, all visitors to Matteawan, including relatives, are fingerprinted despite the fact that members of immediate families are specifically exempted from this requirement under the regulations (7 NYCRR 53.4, subd. [d]).[10]

A similar stark contrast is reflected on the approach to a patient's correspondence. Section 413 of the Correction Law puts all written communication between patients and persons outside Matteawan under the absolute control of the superintendent, who must examine and read such correspondence and is required to forward only communications addressed to the County Judge or District Attorney of the county from which the inmate was sentenced.[11] However, the regulations of the

10. Statement of the Director of Matteawan State Hospital made in 1966 to the Special Committee on the Study of Commitment Procedures and the Law Relating to Incompetents of the Association of the Bar of the City of New York (see Grant H. Morris, The Confusion of Confinement Syndrome: etc., 17 Buffalo L. Rev. 651, 689).

11. Since a civil patient committed under section 85 of the Mental Hygiene Law was not sentenced, he cannot send out even such communication as of right.

Department of Mental Hygiene (14 NYCRR 21.1) specifically provide that "every patient in an institution under the jurisdiction of the department should be permitted to write to relatives and friends."[12] Mail addressed to patients is delivered to the director of the institution who, under the regulations, may, in his discretion, deliver it to the patient unopened if, in his judgment, it is safe to do so; or, if he has a well-grounded reason to believe that to deliver such mail matter to the patient would be unsafe or unwise or prejudicial to the interests of the patient or of the institution, the director may withhold such mail matter for examination and detention, if he deems it advisable, "always having due regard for the prevailing rule as to the inviolability of mail matter and seeking to maintain it whenever it is practicable or proper to do so" (14 NYCRR 21.2).

The far greater restrictions imposed on visitors to Matteawan and on communication by patients confined there with persons on the outside are in themselves a denial of equity of treatment to civil patients transferred there.

The many differences above enumerated between a facility maintained primarily for the custody and care of the criminally insane and a civil mental hospital point up the unreasonableness of the classification established by section 85.

Although the Legislature in section 85 has established procedures to protect the rights of a civil patient to procedural due process, it has selected only patients in State mental hospitals for such treatment, leaving those in all other types of psychiatric hospitals who become dangerously mentally ill free from the threat of commitment to a mental hospital operated primarily for the custody of the criminal mentally ill. In so doing, the Legislature failed to meet the requirement of the equal protection clauses of the State[13] and Federal[14] Constitutions, which require that a distinction such as this "have some

---

12. While the language of this regulation is apparently unlimited, section 21.4 of the same regulations, by inference, permits the Department of Mental Hygiene to suppress some letters sought to be mailed out by patients in State mental hospitals in at least some instances, but it emphasizes that this power may be invoked only in rare cases, for it provides: "The 'proper discretion' which institution authorities may, in the opinion of the post office department, rightly exercise as to preventing the transmission of mail matter addressed by a patient to parties outside, should be exercised in good faith and with fair judgment, erring if at all, on the side of a liberal view of each individual case. The commissioner thinks that comparatively few letters of patients ought to be suppressed, and those only where the objection to transmission is clear and conclusive."

13. N. Y. Const. (art. I, § 6).

14. U. S. Const. (14th Amdt.).

relevance to the purpose for which the classification is made" (*Baxstrom* v. *Herold,* 383 U. S. 107, 111; see, also, *Humphrey* v. *Cady,* 405 U. S. 504). We are aware that both of the cited cases dealt only with a failure of the legislation struck down to include procedural safeguards intended to secure to those threatened with deprivation of liberty by commitment to State institutions for treatment the procedural due process guaranteed by the Fourteenth Amendment, but in both of these decisions the court noted that the creation by a State of functionally distinct institutions for involuntary commitment of certain groups of persons for compulsory treatment may not be wholly arbitrary. It seems obvious, at least to me, that those persons not charged with or convicted of the commission of a crime, and who are found to be dangerously mentally ill, should be confined in maximum security civil hospitals where medical treatment and cure are the primary goal and the hospital must strive to see to it that the "maximum security confinement is positively therapeutic" (*Covington* v. *Harris,* 419 F. 2d 617, 625, *supra*). Any confinement not so intended is constitutionally invidious.

There is still another reason for declaring section 85 unconstitutional as it applies to civil patients. Section 60 of the Mental Hygiene Law provides that preferences shall be given in the State mental hospital system to the admission, care and treatment of mentally ill persons who have insufficient ability to pay for their care, treatment and educational services in licensed private facilities.[15] Although there are not available data or records to show what proportion of those confined to State mental hospitals are there because of poverty as compared with mentally ill patients in local, general and licensed private hospital facilities, it may safely be inferred that the proportion of patients in State hospitals who are poor and disadvantaged is higher than that in other types of mental hospitals. Hence the provision of section 85 mandating transfer of dangerously mentally ill patients in State hospitals to Matteawan

---

15. In the recodification of the Mental Hygiene Law this provision has been omitted. There is no discussion of the omission in the Memorandum of the Joint Legislative Committee on Mental and Physical Handicap (*supra*). But section 43.01 of the recodified law specifies that the Department of Mental Hygiene "shall charge fees for its services to patients, provided, however, that no person shall be denied services because of inability or failure to pay a fee." This language therefore continues the preference established in section 60 of the present law for admission, care and treatment in State hospitals of mentally ill persons who have insufficient ability to pay for their care, treatment and educational services in licensed private facilities.

necessarily falls with greater impact on the poor and the effect of the mandatory provision is indirectly to impose a standard of wealth on those like the respondent. A statutory provision which in practice has such an effect is a denial of equal protection of the law (*Griffin* v. *Illinois,* 351 U. S. 12, *Edwards* v. *California,* 314 U. S. 160; *Shapiro* v. *Thompson,* 394 U. S. 618; *Boddie* v. *Connecticut,* 401 U. S. 371).

It is also noteworthy that in this statute (§ 85) the Legislature, by mandating the transfer of patients in State hospitals found to be dangerously mentally ill after an appropriate hearing to Matteawan, a Department of Correction facility, imposes confinement with the criminally insane on such patients, and moves into a sphere normally left entirely to those charged with administration of the State hospitals, in this case the Department of Mental Hygiene. Here there is no discernible justification for the Legislature's mandate directing transfer of dangerously mentally ill inmates of State mental hospitals only, to Matteawan.

It was conceded on the argument of this appeal that there is at least one and possibly two State mental hospitals under the jurisdiction of the Department of Mental Hygiene that have security wards which do provide maximum security facilities for dangerously mentally ill patients, such as the respondent, and, if such a civil patient is in one of those hospitals, no application is made to transfer him to Matteawan. This, of course, is still another evidence of unequal treatment of those patients in State hospitals subjected to section 85 orders of transfer to Matteawan, since there are available facilities for treatment with maximum security of dangerously mentally ill patients in a State mental hospital, a civil hospital, for some of the patients in the same class as the respondent. But even if there were no such State hospitals with locked maximum security facilities, the action of the Legislature in mandating transfers to Matteawan of dangerously mentally ill patients would not be a reasonable statutory classification. As the Court of Appeals for the District of Columbia has noted, the findings of the doctors and administrators of a public mental hospital as to a patient's need for treatment must be made on the basis of their medical expertise, "for the ' purpose of involuntary hospitalization is treatment ' " and " ' continuing failure to provide suitable and adequate treatment cannot be justified by lack of staff or facilities ' " (*Williams* v. *Robinson,* 432 F. 2d 637, 641). Lack of funds may not be utilized as a pretext to justify a denial of equal protection of the law. While a State has a valid interest

in preserving its fiscal integrity and may legitimately attempt to limit its expenditures for its programs, it may not do so by legislating invidious distinction between classes of its citizens (*Shapiro* v. *Thompson,* 394 U. S. 618, *supra*; see, also, *Doe* v. *General Hosp. of D. C.,* 434 F. 2d 427).

Certainly dangerously mentally ill patients who must be kept in maximum security facilities to prevent them from harming their fellow patients, hospital staff members and themselves may be assigned to such facilities by the State but the method used may not discriminate on the basis of poverty or on the accidental factor of what kind of a public mental hospital the patient had been in when he first showed signs of dangerous mental illness. The State's solution for dealing with him must be scrutinized closely under the equal protection test and, when challenged, the onus of establishing that "no less intrusive means" will advance a substantial and compelling State interest devolves upon the State (cf. *Matter of Atkin* v. *Onondaga County Bd. of Elections,* 30 N Y 2d 401 [June 7, 1972]), citing *Oregon* v. *Mitchell,* 400 U. S. 112, 229, 238 [opn. of BRENNAN, WHITE and MARSHALL, JJ.]; *Shelton* v. *Tucker,* 364 U. S. 479, 488; *Dunn* v. *Blumstein,* 405 U. S. 330). Certainly the means designated by the Legislature, a transfer to Matteawan, a Department of Correction facility, unnecessarily intrudes on the right to treatment and well-being of the respondent, since there are other reasonable ways to achieve the goals set by the State with a lesser burden on constitutionally protected activity, by way of treatment in a civil hospital (*Shelton* v. *Tucker, supra*; *Dunn* v. *Blumstein, supra*).

The appellant contends that in *Baxstrom* v. *Herold* (383 U. S. 107) the Supreme Court did not question that a transfer of a patient with civil status could be made to a Department of Correction facility. However, in that case, the petitioner, Baxstrom, was a convicted felon who had been certified as insane by a prison physician while serving a term in prison and he was attacking the constitutionality of a provision of New York law which permitted his retention, after the expiration of his term in Dannemora State Hospital, an institution of the Department of Correction. He contended that he was thus denied due process and the court merely found that he was entitled to a hearing to determine his mental state. The issue of the differential treatment of dangerously mentally ill patients in State mental hospitals operated by the Department of Mental Hygiene, as against others in other public hospitals, was in no way raised or determined. Here we deal with the propriety

of transferring a civil patient to a Department of Correction hospital under a mandate established by the Legislature in section 85. *Baxstrom* is, therefore, no authority for the propriety of such a commitment of a civil patient, even one dangerously mentally ill, to a Department of Correction hospital set up for the care and custody of the criminally insane, rather than for the " treatment " of civil patients.

The order of the Special Term dated February 24, 1972 denying the petition of the Director of Manhattan State Hospital for an order pursuant to section 85 of the Mental Hygiene Law committing the respondent to Matteawan State Hospital on the ground that his presence in a hospital in the Department of Mental Hygiene is dangerous to the safety of other patients, the officers or employees thereof, or the community, and declaring unconstitutional that portion of section 85 which mandates the transfer of dangerously mentally ill civil patients in State mental hospitals to Matteawan State Hospital upon a finding by the court after a hearing in accordance with the procedures set forth therein should be affirmed insofar as appealed from (see *Doe* v. *General Hosp. of D. C.,* 434 F. 2d 427, 433, *supra*).

HOPKINS, Acting P. J., and MUNDER, J., concur with BRENNAN, J.; SHAPIRO, J., dissents and votes to affirm the order insofar as appealed from, with an opinion, in which CHRIST, J., concurs.

Order reversed insofar as appealed from, on the law, without costs, and application for commitment of respondent granted to the extent of committing him to an appropriate institution in the State Department of Correction.