Valentine A. **NEGRON** et al., Plaintiffs,

v.

Peter **PREISER**, Commissioner of the New York State Department of Correctional Services, et al., Defendants.

No. 74 Civ. 1480.

United States District Court,
S. D. New York.

Oct. 2, 1974.

The Legal Aid Society, Prisoners' Rights Project, New York City, for plaintiffs; William E. Hellerstein, Joel Berger, David A. Englander, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants; Mortimer Sattler, Hillel Hoffman, New York City, of counsel.

Michael Bezirjian, Albany, for defendant, Peter Preiser.

ROBERT J. WARD, District Judge.

This is a motion for a preliminary injunction in a class action brought by patient-inmates of Matteawan State Hospital ("Matteawan") in Beacon, New York, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(3) and (4), and 2201, challenging the constitutionality of certain of the conditions of their confinement. Defendants are the state officials charged with the operation of the facility and some of the employees of the hospital, including correction officers. The complaint alleges violations of the Eighth and Fourteenth Amendments of the Constitution of the United States, in that conditions on Wards 3 and 4,[1] the so-called "jail wards," are so substandard that placement in these isolation wards ("seclusion") is cruel and unusual punishment, in that there are no rules governing patient/inmate conduct, and in that discipline, in particular seclusion, is arbitrarily imposed without the safeguards of due process. The instant motion addresses itself to these charges, requesting that this Court prohibit use of the isolation cells as they now exist, require due process safeguards in connection with any future use of these cells, and order promulgation of rules, accompanied by specific sanctions, to govern patient conduct. In

addition, the complaint alleges brutality, excessive use of physical restraints, and unauthorized dispensing of medication by the prison guards, but these allegations are not at issue at this time.

Matteawan State Hospital is maintained by the New York State Department of Correction pursuant to N.Y. Correction Law § 400 (McKinney's Consol.Laws, c. 43, Pocket Part 1973). That section presently provides:

1. The department of correction shall maintain one or more hospitals, to be used solely for the purpose of holding in custody and caring for such mentally ill persons held under any other than a civil process as may be committed to the department by courts of criminal jurisdiction, or placed therein or transferred thereto by the commissioner of mental hygiene, and for such persons as may be committed thereto pursuant to the provisions of section 29.13 of the mental hygiene law, and for such convicted persons as may be declared mentally ill while undergoing sentence of imprisonment, or upon a commitment as youthful offenders, juvenile delinquents or wayward minors at any of the various penal institutions of the state, and for all female convicts becoming mentally ill while undergoing sentence. When a person is committed or placed in or transferred to the department under the provisions of article seven hundred thirty of the criminal procedure law or section 29.-13 of the mental hygiene law, a copy of the minutes of the proceedings instituted to determine his mental condition shall be furnished to said hospital. The department of correction shall have the jurisdiction and control of such hospitals; but they shall be subject to visitation and inspection of the head of the department of mental hygiene, by himself and his authorized representatives from the department of mental hygiene.

---

I. By letter dated June 20, 1974 (Court's Exhibit 1), Mr. Vito Ternullo, Superintendent of the Fishkill Correctional Facility of which

Matteawan is a part, informed the Court that Ward 4 is no longer used for seclusion purposes.

Amendments to the laws pertaining to Matteawan, effective May 30, 1974, provided that only persons convicted of an offense and under sentence could be held in custody in a hospital within the jurisdiction of the Department of Correction, and required all other persons in such hospitals to be transferred to other institutions by April 1, 1975. 1974 N.Y. Laws Ch. 629 (McKinney's). However, at the present time, the class of patients who bring this action includes both convicted persons within the jurisdiction of the Department of Correction, and persons who have been indicted and ruled dangerous and incompetent to proceed to trial, pursuant to N.Y.C.P.L. § 730.50 (McKinney's Consol.Laws, c. 11–A, Pocket Part 1973). Each of the inmates at Matteawan has thus been adjudged mentally ill in an independent proceeding in New York State Supreme Court, after examination by two court appointed physicians, N.Y.Correction Law § 408 (McKinney's Pocket Part 1973), and sent to Matteawan for treatment or a type of custody which is unavailable elsewhere in the state correctional system. Upon expiration of their sentences these persons are subject to transfer to a hospital within the jurisdiction of the Department of Mental Hygiene, as civilly committed patients, for further treatment, unless the director determines that they are "reasonably safe to be at large." N.Y.Correction Law § 409 (McKinney's Pocket Part 1973).

Defendants essentially contend that Matteawan is a treatment institution, and that seclusion is a medical treatment rather than a sanction. To the limited extent that they address themselves to the issue, they argue that to promulgate rules governing patient conduct and to establish specific sanctions and procedures for imposing sanctions, would defeat the treatment purpose of the institution. Therefore, they argue, due process safeguards are inappropriate, as well as not constitutionally re-

quired. Instead, they claim, there is a formal set of criteria governing the use of the isolation wards as a treatment procedure, including requirements for a physician's continuing authorization and sharply limited permissible durations of confinement.[2]

A long line of cases in both the New York and federal courts have recognized that, while Matteawan is a hospital, it is primarily a maximum security prison institution, and the quality of treatment provided is substantially inferior to that provided in civil hospitals, while the deprivations of personal liberty are greater. *See* Gomez v. Miller, 341 F. Supp. 323 (S.D.N.Y.1972), aff'd, 412 U. S. 914, 93 S.Ct. 2728, 37 L.Ed.2d 141 (1973) and the cases cited therein at 325, 326.

Yet Kesselbrenner v. "Anonymous," 39 A.D.2d 410, 334 N.Y.S.2d 738, 745 (2d Dep't. 1972), rev'd, 33 N.Y.2d 161, 350 N.Y.S.2d 889, 305 N.Y.S.2d 903 (1973), held that the term "care" as used in Correction Law § 400, includes and imports treatment of persons sent to Matteawan. The Court of Appeals, in reversing the Appellate Division, held that the restraints on liberty, due to the high security characteristics of Matteawan, and the secondary importance that treatment programs have in that institution, made commitment there of persons not convicted of any crime violative of such persons' constitutional rights. Nevertheless, as a prison facility housing, in future, only convicted criminals, Matteawan is a hospital, obligated by statute to provide care, including treatment. This circuit has expressed the view that the New York statutory scheme contemplates that a prisoner will be committed to an institution for the criminally insane only if he is mentally ill and in need of special custodial care because of the problem he presents to himself or other prisoners. United States ex rel. Schuster v. Herold, 410 F. 2d 1071, 1087 (2d Cir. 1969). That case

---

**2.** At the hearing on the motion for a preliminary injunction, the most recent version of these criteria was introduced as Defendants' Exhibits A and B.

held that a prisoner in the New York State Correctional system may be transferred to an institution for the criminally insane only if he is formally judged in need of such care and treatment, since the state provides such a formal process for civil commitment to a mental institution. While strongly critical of the actual treatment program at hospitals within the jurisdiction of the Department of Corrections, the Court in *Schuster* found that the procedural posture of the case prevented its ruling on the question of adequacy of care. For the moment, the Court accepts the proposition that the institution's purpose is to provide some form of treatment.

When this motion was first brought, the Court decided to inspect the relevant areas of Matteawan to determine whether the conditions did violate the constitutional prohibition against cruel and unusual punishment. Accordingly, on June 13, 1974, having declared its intention the preceding week, the Court toured Wards 3 and 4, the isolation or so-called "jail" wards[3] and then held the first part of an evidentiary hearing on the grounds of the institution, in a gymnasium occasionally used for such purposes. The second part of the hearing was later held in the United States Court House in New York City.

Wards 3 and 4 consist of two long corridors, one upper and one lower, laid out identically. The corridors are lined on either side with solid doors which lock from the outside, each leading into a cell approximately six feet by ten feet in dimension. Each of these cells has a window in the far wall, covered by heavy, cage-like screening. There is also a small barred window, about one foot square, in each of the doors to the cells at about eye level. About half of the cells contain sinks and toilets; at the time of the Court's visit all of them contained cots with mattresses, sheets and what appeared to be new blankets. There is a community shower and toilet facility halfway down the corridor of each ward. Those cells lacking private toilet facilities each contain a "bucket" or open bedpan as a substitute. The plaintiffs complain that toilet paper is not supplied; the Court observed that in at least one case this was true, although at the time of its inspection most cells were supplied with toilet paper.

There are apparently two groups of patients who are housed in these cells. One group is there by choice, for protection from other inmates whom they fear, and to calm down if they sense themselves in states of uncontrollable agitation. The staff accommodates these patients by allowing them to reside in Ward 3 on a temporary or semi-permanent basis, with the door to their cells open unless in a given case the patient requests that it be locked. The Court observed that at the time it toured the ward, perhaps half of the doors were unlocked, with the patients free to come and go, on the ward, as they chose. The other group of patients is confined in isolation cells against their wills, after some incident, usually a disruptive interaction between patients or between a patient and a guard, prompts a staff determination that such confinement is indicated. At the time that the Court toured the wards it appeared that those who were there voluntarily occupied the more desirable of the cells, that is, those with the toilet and sink facilities, yet were also free to come and go. By contrast, most, if not all, of those locked in the isolation cells against their wills occupied cells without toilets.[4]

---

3. As noted earlier, Ward 4 is no longer used for seclusion.

4. At the time of this inspection, the Court indicated to Superintendent Ternullo that it considered conditions in the cells without toilets to be below the constitutionally required minimal standards. See LaReau v. MacDougall, 473 F.2d 974 (2d Cir. 1972), cert. den., 414 U.S. 878, 94 S.Ct. 49, 38 L. Ed.2d 123 (1973); Osborn v. Manson, 359 F.Supp. 1107 (D.Conn.1973). Accordingly, the Superintendent then agreed to use the rooms without toilet facilities only for those patients whose doors are not locked, or in "absolute emergencies of confrontation or

The defendants' account of how the prisoners are treated in the isolation cells differs in some key respects from that of the prisoners themselves. According to the prisoners, they are routinely allowed outside their locked cells at most once or twice a day, for five minutes or less, to empty their buckets or bedpans. Occasionally a guard will bring some water to the window in the cell door, which the prisoners may sip through a straw-like spout in the community cup, through the window. Meals are brought to the door at meal time. When the Court inspected the ward, several of the prisoners were dressed only in underwear; they contend that they frequently and for no medical reason are not permitted to keep their regular clothes in these cells.

The defendants state that prisoners who are locked in these cells are released several times a day, and even upon request, to empty their buckets or bedpans, to shower on a regular basis, and to exercise. They justify removing patients' clothing by stating that prisoners who are agitated may use their clothing to attempt suicide or to damage the cells, for example, by clogging the toilets.

The prison doctor and the superintendent, who also testified, claimed that the decision to place a patient in an isolation cell was always a medical decision, based on an evaluation of the likelihood of the patient's injuring himself or others, or "other medical or surgical reasons." Thus, as they explained to the Court, if a patient assaults another patient, attempts to injure himself, or even engages in a vociferous argument with a guard or resists a guard's instructions, he may be transferred to the isolation ward. One incident which prompted the transfer of fourteen patients to the jail ward involved a general spree on June 1, 1974, in which the patients locked several guards in a closet, wreaked havoc on

the ward, raided the medicine closet and ingested various drugs, and then released the guards. The patients were transferred to the jail ward immediately, where they remained for ten days. One of the prisoners involved in that incident testified on June 13, 1974. He claimed that he had been beaten, placed in a completely empty cell wearing only his underwear, allowed to leave his cell for only five minutes during a day, for a period of almost a week.

Another key respect in which the testimony of the prison officials and the prisoners differed concerned the degree of medical supervision accorded those in the isolation cells. The prisoners claimed to be in the isolation cells for periods of days or weeks without a visit from a physician. For example, the prisoner involved in the incident of June 1 could recall having been visited only twice by a physician while he was in seclusion. Another prisoner, who had been placed in seclusion after he struck an inmate with a broom, testified that he was confined to a locked isolation cell wearing only his underwear for five months, and could recall only one visit by a physician during that time. On the other hand, the chief prison psychiatrist, Dr. Sweeney, testified that all patients are examined regularly, because he makes rounds on a daily basis. He stated that no patient was so confined without continuing specific authorization of a physician who had examined the patient within a brief time of his initial confinement and regularly thereafter. The records which the hospital kept of this seclusion are sketchy at best, consisting only of the seclusion order signed by a physician, and do not reflect the degree of medical supervision which the doctor claims exists.

The Court is faced with a difficult problem in assessing the credibility of all the witnesses. On the one hand, it must scrutinize with care the accounts

---

disturbance," or when a patient overtly threatens to destroy the plumbing or to injure himself by banging against it. He later

confirmed this intention in a letter to the Court which is in evidence as Court's Exhibit 1.

of persons who are mentally ill, and is not medically trained to discern the facts from the fantasy in the accounts of patients. But it is also impossible wholly to credit the prison officials, well meaning though they may be. The institution, with six psychiatrists and four hundred and seventy patients, is understaffed for the provision of intensive psychiatric care, and individual attention is minimal, even by Doctor Sweeney's own account, for those who are placed in the isolation ward. A recent decision of the New York Court of Appeals recognizes the inadequacy of psychiatric treatment there. *Kesselbrenner, supra.* The doctor's recollection of having administered a physical and psychiatric examination, adequate to justify use of the isolation cell as a treatment, and to justify its continuing use, when unsupported by medical records detailing the indications for the treatment and when the time spent in such examination is admittedly brief, is insufficient to offset the patient's recollection that there was no such examination.

 The federal courts are extremely reluctant to interject themselves into the day to day administration of state correctional institutions. Preiser v. Rodriguez, 411 U.S. 475, 491, 498, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). But where the conditions of confinement clearly violate rights guaranteed prisoners under the Constitution of the United States they will intervene. Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal. 1971). While the rights of prisoners are severely circumscribed, clearly among the rights which persons retain even after incarceration are freedom from cruel and unusual punishment, and freedom from the arbitrary imposition of serious sanctions. Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Wright v. McMann, 387 F.2d 519 (2d Cir. 1967); Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968).

██ The courts are even more reluctant to intervene in the operation of medical facilities, or to substitute their judgment for that of a physician in medical matters. Even when there is statutory authorization for a federal court to oversee aspects of the administration of a federal medical facility, the question before the court is not whether the hospital has made the best decision, but whether it has made a permissible and reasonable decision in view of the relevant information and within a very broad range of discretion. Jones v. Robinson, 142 U.S.App.D.C. 221, 440 F. 2d 249, 251 (1971). And the range of discretion is greatest where the judgment is medical, not administrative.

The instant case presents especially difficult problems because Matteawan is both a correctional facility and a hospital. The same behavior which in an ordinary prison would simply be a violation of stated rules, incurring defined sanctions imposed only after some fair procedure, in Matteawan is called a symptom or expression of mental illness, which is not a violation of the rules, for there are no stated rules, but which warrants a treatment on the surface resembling in every respect serious punishment in a prison. The judgment whether to place a person in seclusion is thus based almost exclusively upon an evaluation of a condition, that is, "dangerousness," not an objective determination that certain rules were broken.

██ That placing a person in an isolation cell is a serious step has been recognized by the courts for some time. While it is not, of itself, cruel and unusual punishment, if the conditions are grossly substandard, as when toilet facilities are lacking, or if the confinement is unduly prolonged, it may be considered cruel and unusual punishment. Wright v. McMann, *supra*; Sostre, *supra*. In any event, use of this serious sanction is surrounded by due process safeguards. Sostre, *supra*; Clutchette v. Procunier, *supra*.

Use of seclusion as a "treatment" is, in this Court's view, no less serious a step.

■ Several courts have recognized that, in the context of civil commitment, the substantial loss of liberty which involuntary commitment to a mental hospital represents is justified only by a corresponding "quid pro quo" in the form of some type of rehabilitative therapy. See Donaldson v. O'Connor, 493 F.2d 507, 519 (5th Cir. 1974) and cases cited therein. Beyond this, it has been held that civilly committed mentally ill persons are entitled to the form of treatment least restrictive of their personal liberty. Covington v. Harris, 136 U.S. App.D.C. 35, 419 F.2d 617 (1969). And courts have clearly held that in the context of civil commitment by reason of mental illness, transfer to a maximum security ward or cell as an administrative matter must be surrounded by due process safeguards. Jones v. Robinson, *supra;* Williams v. Robinson, 139 U.S. App.D.C. 204, 432 F.2d 637 (1970). Thus, the mentally ill do not forfeit their basic constitutional rights, when they enter an institution for treatment.

■ The prison officials themselves recognize the seriousness of this form of treatment. No other medical treatment is so surrounded with express limitations, including the requirement that a physician authorize its use, evaluate the patient at regular and brief intervals, and discontinue it after a specific short time unless he expressly determines that it must be continued. In theory, this formal decision by a highly educated professional, that the symptom or condition exists, that this treatment is indicated and is not disproportionate to the "symptom," and that the treatment will not continue beyond the time it is indicated, accomplishes the function of protecting the patient from an arbitrary deprivation of a right or privilege which in a prison is accomplished by a form of due process hearing.

However, after hearing all the testimony in two days of hearings, the Court concludes that these safeguards are, in practice, somewhat illusory. The hospital records do not reflect any of the bases upon which the decision to select this treatment rests, nor do they indicate the degree of medical supervision which the hospital rules require, which the doctor testified exists, and which the prisoners themselves deny receiving.

[10] On a motion for a preliminary injunction, the Court must consider whether the plaintiffs demonstrate either a likelihood of success on the merits and the probability of irreparable harm during the pendency of the lawsuit, or serious questions going to the merits and a balance of hardships tipping sharply in their favor. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969), cert. den., 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

■ This Court fully recognizes the difficulties inherent in the administration of a facility which must provide simultaneously the degree of security required in a correctional institution, and the quality of care or treatment needed by the mentally ill. It in no way wishes to restrict unduly either the treatment program or the safety features of the institution. But it must recognize, even upon brief inspection and expert testimony, that use of seclusion is a drastic measure, rightly perceived by the inmates as a substantial loss of liberty. Also, it is apparent to the Court that at Matteawan the cells are at least on some occasions used for the purpose of maintaining order, not simply treating agitation. While this is certainly a legitimate consideration, in a purely prison setting comparable use of isolation, for the comparable purpose of maintaining prison discipline and promoting the safety of the occupants, is surrounded with strict procedural safeguards, and cannot go beyond the limits of "cruel or unusual" punishment. Persons in a treatment setting are entitled to no less. Plaintiffs have demonstrated very serious questions going to the merits of this case, and the probability of serious and irreparable harm during the pendency of

this litigation. The Court will therefore grant that preliminary injunctive relief which, it judges, best reflects all the competing considerations.

The Court will require extensive records to be kept of every instance in which an isolation cell is used. The purpose of such records will be to ensure and document that the decision to use the isolation cell is based on explicit criteria, is reviewed at the requisite brief intervals, and is, where possible, supplemented by other forms of treatment. In this connection, the Court observes that the proposed form, attached to the regulations which the Department issued on July 18, 1974, is insufficient. Specifically, the Court requires a daily record, with a detailed statement of the examining physician's clinical observations of the patient, including the patient's physical condition, apparel, overt behavior, and mental status, a statement of the physician's reasons for initiating or continuing the seclusion procedure, and a statement of his treatment plan.

At this time, the Court has received assurances that those cells on Ward 3 which lack toilet facilities will be used to house only those patients who are free to leave the cells when they choose, or those patients who are so acutely agitated that they overly threaten to use the toilet facilities to harm themselves or others. Such states of acute agitation will of course be reflected in the careful records which this Court will henceforth require the hospital to keep. Accordingly, the Court at this time declines to hold that the conditions of the isolation cells violate the Eighth Amendment.

The Court has not heard sufficient testimony at this stage to require promulgation of rules governing patient behavior, and accompanying specific sanctions. It may be that the state, although thus far it has failed to persuade the Court, can provide, through expert testimony, a sufficient medical justification for the absence of such regulations, to which prisoners are otherwise entitled. Likewise, even though it is evident that one function of the isolation cells at Matteawan is to ensure the orderly operation of the institution, that in this sense they are quasi-disciplinary, the Court is likewise not prepared, at this juncture, to require a due process type of hearing to accompany the use of seclusion.

Accordingly, the motion for a preliminary injunction is granted only to the extent that the Court requires officials at Matteawan to maintain records as described herein.

Settle order on notice.