Valentine A. NEGRON et al., Plaintiffs,

v.

Benjamin WARD etc., et al., Defendants.

No. 74 Civ. 1480.

United States District Court,
S. D. New York.

Oct. 16, 1978.

William E. Hellerstein, The Legal Aid Society, Prisoners' Rights Project, New York City, for plaintiffs; John Boston, Norma P. D'Apolito, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for defendants; Mark C. Rutzick, Margaret A. Goederer, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Defendant Vito Ternullo, at the time of the acts complained of, was Superintendent of Fishkill Correctional Facility, which included Matteawan State Hospital for the Criminally Insane ("Matteawan").[1] Following a jury trial, Ternullo moves pursuant to Rule 50(b), Fed.R.Civ.P., for judgment notwithstanding the verdict or, in the alternative, for a new trial, on that portion of the verdict finding that plaintiffs Valentine A. Negron, George Dunleavy, Edward Carvalho and Peter Perez, who at the time of the acts complained of were state prisoners confined at Matteawan, were denied due process, and consequently suffered mental anguish, suffering or outrage, by being retained on Ward 3, the "jail ward" at Matteawan, solely for punitive or disciplinary reasons, after being transferred, without any medical, psychiatric or protective justification, from Ward 6, an "open ward" at Matteawan, without ever being afforded a hearing. For the reasons hereinafter stated, the motion is denied.

## FACTS

On June 10, 1975, plaintiffs were confined on Ward 6. Ward 6 was an open dormitory ward consisting of a common room for sleeping, a day room and a porch. Patients assigned to this ward were permitted to leave the ward to work at jobs in the institution in exchange for small wages, to make purchases at the commissary, to engage in various institutional programs such as school and occupational therapy, and to attend psychological counselling. They also were permitted to engage in recreation and associate with the general inmate population in the gymnasium, in the institution's large yard, and in the mess hall during meals.[2]

---

1. At the time this suit was commenced, Matteawan was maintained by the New York State Department of Corrections for treatment of prisoners declared mentally ill. Responsibility for operating the institution was thereafter transferred to the Department of Mental Hygiene. Matteawan was subsequently closed and, on or about September 15, 1977, completely replaced by a new facility known as Central New York Psychiatric Center, which is currently maintained by the Department of Mental Hygiene.

At the preliminary injunction stage this Court declared: "[W]hile Matteawan is a hospital, it is primarily a maximum security prison institution . . . .. Nevertheless, as a prison facility . . . Matteawan is a hospital, obligated by statute to provide care, including treatment." *Negron v. Preiser*, 382 F.Supp. 535, 538 (S.D.N.Y.1974).

2. For example, prior to June 10, 1975, Dunleavy was Institutional Law Clerk, worked in the library, worked on the newspaper, played

At approximately 4:30 P.M. on June 10, 1975, there was a disruption on Ward 6, leading to a confrontation between corrections officers and prisoners and ending in plaintiffs' being removed from Ward 6 and placed in seclusion on Ward 3. The incident began when one of the inmates on Ward 6, Robert O'Connor, became upset and began overturning chairs because he had not been given his medication. One of the officers on the ward "dropped the phone," a procedure which triggered an alarm to all officers assigned to emergency duty. Within a few minutes, defendant Leander McCall, a corrections officer, entered Ward 6 in response to the alarm. When McCall entered the ward, O'Connor had been calmed down by other patients. McCall began escorting O'Connor off the ward to get his medication. A dispute ensued when Negron, who was ward president, insisted on accompanying McCall, whom he distrusted because of his bad reputation among inmates. McCall told Negron to mind his business. Negron retorted that as ward president it was his business. Shouting escalated into physical contact between McCall and Negron, and other patients began crowding around. Additional officers responding to the alarm arrived to find McCall and Negron shouting and struggling and patients gathering in the doorway. These officers then became involved in a skirmish in which other inmates on the ward joined. The upshot of it all was that plaintiffs Negron, Dunleavy and Carvalho were forcibly removed from Ward 6 to Ward 3 and placed in seclusion.[3] A couple of hours later, plaintiff Perez, who was still upset and was thought to have been causing unrest amongst other inmates on Ward 6, was also taken to Ward 3 and placed in seclusion.

handball, went to the gym, commissary, church, movies and mess hall. Prior to June 10, 1975, Negron was a member of the Liaison Committee, which oversaw 1400 prisoners, and was President of Ward 6. The latter position, for which he was paid, entailed handling inmate complaints, investigating problems with programs, and meeting on a monthly basis with the administration. He was also Chairman and founder of the Green Valley Equitable Defense, which assisted inmates in drafting complaints and filing for social security, etc., President of the Jaycees, and co-editor of the newspaper. He also went to therapy. Prior to June 10, 1975, Carvalho had been receiving group therapy twice a week plus individual therapy and occupational therapy. In addition, he worked on the Compound Gang and went to the yard, the gym, the commissary and performed weightlifting. Prior to June 10, 1975, Perez was Chairman of the Liaison Committee, a member of the Jaycees, worked on the Compound Gang and as a porter, sometimes attended school, and participated in basketball and weightlifting.

3. Much of the testimony at trial concerned whether the provocateurs were the officers or inmates, and whether the officers used excessive or unjustified force in quelling the disturbance irrespective of who had provoked it.
Plaintiffs characterized the defendant corrections officers, especially McCall, as being "out to get them," particularly Negron and Dunleavy, in retaliation for Negron's and Dunleavy's bringing litigation, filing complaints, and writing letters to public officials. Dunleavy had filed three complaints against McCall and Negron had filed complaints against McCall, Cleary, Olivo and other officers.
The corrections officers characterized plaintiffs as troublemakers, assaultive, and security risks. They claimed that Negron was the provocateur and the other plaintiffs joined in as aggressors.
Negron claimed to have been beaten on Ward 6 by McCall, and beaten by McCall, Cleary, and Olivo while being carried to Ward 3 or on Ward 3. Dunleavy claimed to have been beaten by McCall on Ward 6 and on Ward 3. Carvalho claimed to have been kicked in the groin by Olivo while on Ward 3.
The jury found that McCall had subjected Negron to unjustified or excessive force on Ward 3, but had done so in good faith, and had not subjected Negron to such force between Ward 6 and Ward 3 or on Ward 3. Accordingly, McCall was found not liable. The jury found that Cleary and Olivo had subjected Negron to unjustified or excessive force between Ward 6 and Ward 3 or on Ward 3, had not acted in good faith in doing so, and had acted with malice or gross or reckless disregard for the rights of Negron. They found Cleary and Olivo jointly and severally liable to Negron for $1.00 in compensatory damages, and individually liable to Negron for $100.00 in punitive damages. (See Memorandum Decision filed this date, denying Negron's motion for a new trial on the compensatory damages awarded against Cleary and Olivo.) The jury found against Dunleavy and Carvalho on their brutality claims.

Ward 3 consisted of two long corridors, one upper and one lower, laid out identically. The corridors were lined on either side with solid doors which locked from the outside and which led into a cell six feet by nine feet two inches.

Patients housed on Ward 3 fell into two categories. "Census patients" were assigned to the ward on a residential basis and generally were not secluded. "Visiting patients" were assigned to another ward but were housed temporarily on Ward 3, usually in seclusion. A patient who was secluded was placed in a cell with the door locked from the outside.

From June 10 to June 12, 1975, plaintiffs were "visiting patients" on Ward 3 and were secluded. Essentially, without going into the particular facts regarding the conditions of each plaintiff's confinement, seclusion was like solitary confinement in a strip cell. Each of the plaintiffs was stripped to his underwear and locked in a cell containing minimal accommodations such as a mattress and a toilet. Each plaintiff was thus physically and socially secluded from June 10, 1975 to June 12, 1975.[4]

At trial there was extensive testimony as to the procedure followed in ordering seclusion, the purpose of using seclusion and possible adverse effects of seclusion. The procedure for ordering it was governed by General Order 21, which provided that patients could be secluded only for appropriate medical or surgical reasons or to prevent a patient from injuring himself or others. It further provided that seclusion could be authorized only by an order signed by a physician. According to internal rules of the institution, a seclusion order could be signed by a physician only upon a personal examination either before or immediately after the patient was taken to the seclusion ward, and a seclusion order would run only until 9:30 A.M. the next morning, at which time another written order of a physician would be required to extend seclusion. The maximum period of continuous seclusion could not exceed three hours in the daytime, and the patient had to be visited every hour, day and night.

Dr. Frank L. Rundle, plaintiffs' expert psychiatrist, testified that the kind of behavior justifying seclusion would be conduct posing an immediate threat of serious harm to others or significant destruction of property. He explained that the secluded patient should be re-evaluated and spoken to immediately, and if the patient does not respond, then he should be treated with medication. No patient should be secluded for more than two hours because other methods of treatment are more effective [5] and seclusion can actually impede treatment and have other deleterious effects. For example, secluding a patient because of a violent outburst caused by a delusion that he was going to be hurt or might hurt someone else could intensify the delusions and hallucinations and make it more difficult to treat that patient. Or secluding a depressive, cutting him off from other people and activities, could make him more depressed and withdrawn, more involved with his ruminations, and more difficult to treat. Another patient might become frightened of being locked up and act in an aimless, violent or destructive manner. Dr. Rundle saw no justification for removing the clothes of a patient in seclusion. In response to the argument that the clothes must be removed to prevent their being used as a means for committing suicide, he stated that seclusion is absolutely contraindicated for a suicidal patient because isolation intensifies suicidal tendencies.

---

4. Because Dunleavy complained of claustrophobia, his door was not continuously locked, although he too was forced to remain within.

5. That Dr. Rundle's views are not aberrational is suggested by a May 11, 1973 memorandum written by Dr. Paul C. Agnew, Director of Matteawan, stating that

[a]s a general policy of treatment in Psychiatry Today [seclusion and restraint] should be looked upon as short-term in nature, measures that must be taken to control behavior pending tranquilizing medication prescribed in adequate dosage taking effect. This means that whenever the above measures are used the doctor should at the same time initiate adequate tranquilizer therapy on the expectation that within a few hours or a day the effect of the tranquilizer will make [seclusion or restraint] no longer necessary.

In this case, an order secluding plaintiffs was signed on June 10, 1975 by Dr. Ruhiye Seyhun, an unlicensed physician who was not a psychiatrist, and was working as a clinical physician in the elderly and handicapped department at Fishkill Correctional Facility, of which Matteawan was a part. Dr. Seyhun testified that the standard procedure was for the corrections officers to ask her if it would be all right to seclude or strait-jacket a patient. She would examine the patient and if there were no physical or psychological reason not to, she would give her approval.[6] She explained that she would not give the corrections officers instructions, she would ask them for instructions. For example, she would ask the corrections officers what items should be put in the seclusion cell and whether the patient should be put in a restraining sheet. If she agreed with what the corrections officers wanted to do, she would fill out and sign the order. In fact, sometimes the corrections officers would fill out the order and she would simply sign it, if she agreed. In Dunleavy's case, Dr. Seyhun ordered seclusion for the stated reasons that he had been assaultive to officers and attempted to incite a riot—events which she did not see— and that he was aggressive—although he had not been aggressive toward her. She wrote "strip cell," meaning no metal bed, sheets or blankets. She explained that the latter items are withheld to prevent a suicidal patient from hurting himself. In Dunleavy's case she took this precaution even though he appeared to her to be "nor-mal," not suicidal, because she relied on the emotional status perceived by the officers.

Seclusion was extended on June 11, 1975 by order of Dr. Atilla Cakir, an unlicensed psychiatrist assigned to Ward 3. He testified that he ordered continued seclusion on June 11 to calm plaintiffs and to permit continued observation so that he could make a more informed judgment as to whether they needed to be secluded.[7] Then on June 12 he had a conversation with Ternullo in which he told Ternullo "I cannot keep them in seclusion or anything else, I cannot do it."

On the basis of the foregoing testimony, as well as the testimony of plaintiffs and corroboration from other witnesses and documents, the jury found that the seclusion of plaintiffs in strip cells from June 10, 1975 to June 12, 1975 was without medical, psychiatric or protective (i. e. to prevent the patient from injuring himself or others) justification, and that the seclusion of these patients without such justification constituted cruel and unusual punishment. The jury also found that the conditions and circumstances of the seclusion were repugnant to the conscience of mankind or violated evolving standards of human decency or involved unnecessary and wanton infliction of pain or suffering.[8] However, the jury found that defendant Ternullo was not responsible for the placement of plaintiffs in seclusion on June 10, 1975.[9]

When plaintiffs were released from seclusion on June 12, 1975 they were confined on the upper level of Ward 3, the "jail ward,"

6. Dr. Seyhun described Dunleavy as cooperative, good, patient and respectful, not aggressive or violent. When she examined him he was hyperventilating, had high blood pressure, asked to be given something other than Thorazine, to which he claimed to be allergic, and asked to be strait-jacketed rather than secluded because he had claustrophobia. Nonetheless, Dr. Seyhun concluded that Dunleavy would not be harmed by seclusion, so she ordered it and prescribed Thorazine.

7. Although Dr. Cakir testified that he continued seclusion because the plaintiffs were excited and he needed to observe them further to determine if they could be released, on the seclusion orders he wrote as the reason for continuing seclusion: Dunleavy—"quiet and depressed"; Negron—"irritable and moody"; Perez— "tense, irritable, hostile". For Carvalho no reason was given, but his behavior was described as "alert and cooperative" and his mental status as "oriented".

8. These findings are not challenged by the instant motion.

9. The jury also found that defendant Paul Metz, the Deputy Superintendent for Security on June 10, 1975, was not responsible. Prior to the jury deliberations, plaintiffs voluntarily dismissed these seclusion claims against the corrections officers. Dr. Seyhun and Dr. Cakir were not defendants.

as "census patients" until late September.[10] There were approximately 15 people confined on this level at any given time. Although permitted out of their cells during the day, plaintiffs were isolated from important and normal institutional associations and activities, including all of the activities enumerated in note 2, *supra*. For a period of several months they were prevented from associating with any inmates in the general population and prohibited from moving anywhere within the institution. As a result, they were not permitted to work at any institutional jobs, they were denied access to the institutional yard, they were prohibited from going to the gymnasium or to the auditorium for movies and institutional functions and they were denied the opportunity to go to the library, the commissary or any other institutional activity. Thus, they were forced to remain idle most of the time. Although they were eventually given access to certain activities, such opportunities were made available only gradually and on a limited basis. Defendants' own witness, Thomas L. Malnic, the corrections officer in charge of Ward 3 from 6:00 A.M. to 2:30 P.M., testified that plaintiffs were on the ward about four weeks before they began getting their programs back, and the programs they were given—use of the small yard, television, ping pong, interviews with the psychiatrist—were minimal in comparison with those provided to inmates in the rest of the institution.

Dr. Rundle testified that involvement in institutional activities, such as those described in footnote 2, *supra*, was a vital part of treating psychiatric patients. In addition, he asserted that when a patient is disciplined he should be told why he is being disciplined, and allowed to give his side of the story. If the patient is not given an opportunity to explain, the discipline cannot have a constructive effect and may have a destructive effect such as resentment, anger and a negative feeling toward the treatment staff.

Dunleavy testified that in August he was asked if he would like to leave Ward 3, and he replied that he did not want to leave until they were all given a hearing justifying what had been done to them. In September his social worker asked him to send Mr. Ternullo a list of the programs he wanted, but he declined to do so because he believed that his attorneys had already informed Mr. Ternullo of what he wanted.

Negron testified that he and Dunleavy tried to obtain a hearing and that he communicated with defendants Metz and Ternullo asking if he could get his programs back. Metz did not answer. Ternullo, by letter dated June 20, 1975, replied in part: "Because of your actions on June 10, your program in the general population has been restricted."

Defendant Paul Metz, who was Deputy Superintendent of Security on June 12, 1975, testified that the decision to confine plaintiffs as census patients was an administrative decision to which he was a party and which involved the Chief of Psychiatric Services (Dr. Sweeney), the representative of the program area, and "of course conversations with Superintendent Ternullo." He did not recall plaintiffs' communicating with him about their programs and disclaimed responsibility over the programs, contending that those decisions were made by Ward Teams made up of a psychiatrist, a psychiatric nurse, a social worker, and the program coordinator, with input from the corrections officers working on the unit. He stated that there was such a team on Ward 3 and "to the best of his knowledge" that team made program decisions.

Vito Ternullo testified that he was aware that plaintiffs had been made census patients, but that he did not know who made the decision. The standard operating procedure would have been for a team to make the decision, but he did not believe he was part of the team that made the decision. He was informed of the decision, but testi-

10. Negron got off the jail ward in late August when he was transferred out of Matteawan and back to prison.

fied that he did not know the reason for it. He explained that a transfer from one ward to another would be made by a team for a programmatic or psychiatric reason. An inmate dissatisfied with his program could contact any number of people, including Ternullo, to whom the program director reported directly.

In view of Metz' admission that he and Ternullo had been involved in the decision to retain plaintiffs on Ward 3 as census patients, and Ternullo's reply to Negron's inquiry as to why he was being retained on Ward 3, and the fact that Ternullo was Superintendent, and the program director reported directly to him, the jury could have rejected as incredible Ternullo's testimony that he did not know who made the decision to classify plaintiffs as census patients. In addition, the jury could have taken into account Ternullo's failure to specifically pinpoint which individuals were responsible for the decision to transfer plaintiffs and eliminate their programs. The jury also could have considered the failure to call as witnesses the Chief of Psychiatric Services (Dr. Sweeney), who was available, the Program Director, and members of the so-called Ward Team.

The jury found that when the overall conditions of each plaintiff's confinement as a census patient on Ward 3 were compared to the conditions of his previous confinement on Ward 6, each plaintiff had suffered a substantial deprivation or a major negative change in the conditions of his confinement by being confined as a census patient on Ward 3 after June 12, 1975. The jury also found that plaintiffs were retained on the jail ward after June 12, 1975 solely for punitive or disciplinary reasons, that Ter-

nullo was personally responsible for their being kept on the jail ward, and that Ternullo did not act in the good faith, reasonable belief that his actions did not violate plaintiffs' rights.[11] In addition, the jury found that plaintiffs would not have been punitively confined as census patients if they had had a hearing, and that, consequently, each of the plaintiffs suffered mental anguish, suffering or outrage as a result of being denied a hearing.[12] In compensation therefor, the jury awarded each plaintiff $125.00. Ternullo was not found liable for punitive damages.

## DISCUSSION

Ternullo asserts as alternative bases for the relief sought that:

1. the decision to transfer a patient to another ward is completely discretionary and therefore plaintiffs had no due process "entitlement"; and even if they did have an entitlement, the conditions of confinement on Ward 3 were not so adverse as to constitute a substantial deprivation to trigger the application of due process procedures;

2. due process procedures are not applicable to the use of confinement in a prison psychiatric hospital because the subjective determinations to confine such inmates in seclusion or other restricted confinement are not susceptible to adjudicatory fact-finding procedures;

3. there was no hearing requirement in 1975 and even if the Court were to hold that there is a hearing requirement now, such a holding cannot operate retroactively to create liability for damages;

As to the latter, the jury found that none of the plaintiffs suffered pain, injury or loss, physical or mental, as a result of being confined on Ward 3 as a census patient. However, they found that Negron was denied access to certain institutional programs by Ternullo and, as a result, was deprived of necessary treatment for serious psychiatric needs, in deliberate indifference to such needs, causing Negron to suffer pain, injury or loss, physical or mental, in the amount of $125.00 in compensatory damages. This finding is not challenged by Ternullo.

---

11. The jury found that defendant Metz was not personally responsible.

12. The Court was attempting to apply *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), when it asked the jury to determine whether plaintiffs would have been confined as census patients if they had had a hearing and, if so, whether any plaintiff suffered any mental anguish, suffering or outrage as a result of being denied a hearing, as opposed to as a result of being confined on Ward 3 as a census patient.

4. as a matter of law, Ternullo acted in the good faith, reasonable belief that a hearing was not required.

The thrust of plaintiffs' position is that as patients confined to a state prison hospital they had a state-created right to psychiatric treatment which could not be impaired by the imposition of discipline without due process. They contend that their right to psychiatric treatment was infringed upon by their being transferred solely for punitive reasons from an open ward, where they enjoyed participation in a variety of therapeutic programs and activities, and placed on the jail ward, where their activities were drastically curtailed. Therefore, they argue, under *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), that they were entitled to a hearing with regard to their transfer from Ward 6 to Ward 3. This Court agrees.

1. *Plaintiffs Were Subjected to Discipline Which Deprived Them of an Entitlement. Therefore, They Were Entitled to a Hearing under Wolff v. McDonnell.*

*Wolff v. McDonnell, supra*, is the seminal case on due process rights in prison discipline and was decided a year before Ternullo punitively confined plaintiffs to the jail ward without a hearing. The familiar holding of *Wolff* is that

the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

418 U.S. at 557, 94 S.Ct. at 2975. In dictum the Court stated that its holding would also apply to imposition of solitary confinement because

[t]he latter represents *a major change in the conditions of confinement* and is normally imposed only when it is claimed

and proved that there has been a major act of misconduct. Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. *We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges.*

*Id.* at 571–72 n.19, 94 S.Ct. at 2982 (emphasis added).

*Wolff* must now be read in light of *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), which held that where state law granted prison officials complete discretion to transfer prisoners from one prison to another and did not require such transfers to be conditioned upon the occurrence of a specific event, and state law did not give prisoners a right to remain in the prison to which they were originally assigned, no due process hearing was required to transfer a prisoner to an institution subjecting him to substantially more burdensome conditions. The Court reasoned: "we cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause," 427 U.S. at 224, 96 S.Ct. at 2538 (emphasis in original), meaning that where there was no state-created entitlement, a liberty interest would not be created solely on the basis of the degree of deprivation suffered. *Accord, Moody v. Daggett*, 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976).

Based on *Meachum*, Ternullo argues that ward reassignments and denial of participation in institutional programs and services were totally within the discretion of Matteawan administrators, and no New York statute gave plaintiffs a right to remain on a ward and participate in certain programs and services; therefore, the transfer of plaintiffs to Ward 3, their reclassification as census patients, and the taking away of their programs did not implicate a due proc-

ess right. On the basis of *Wolff*, Ternullo argues that the deprivation plaintiffs suffered did not amount to "a major change in the conditions of confinement," but, rather, amounted only to a "lesser penalt[y] such as loss of privileges." Ternullo asserts that the latter is insufficient to invoke due process procedures.

Taking Ternullo's *Wolff* argument first, the Court regards this as merely a resurrection of Ternullo's argument to the jury that the deprivations plaintiffs suffered in being confined on the jail ward were minimal and were outweighed by certain advantages plaintiffs enjoyed on Ward 3. The matter having been relegated to the jury's province, the standard for upsetting that verdict by a judgment notwithstanding the verdict is quite stringent.[13]

> Simply stated, it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached. [Furthermore] the evidence must be viewed in the light most favorable to the party against whom the motion is made and he must be given the benefit of all reasonable inferences which may be drawn in his favor from that evidence.

*Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2524 (1971). Moreover, the evidence which must be considered is not all the evidence, but only the evidence favorable to the non-moving party and the uncontradicted, unimpeached evidence unfavorable to the non-moving party, *Bigelow v. Agway, Inc.*, 506 F.2d 551, 554 (2d Cir. 1974); *Horowitz v. Anker*, 437 F.Supp. 495, 503 (E.D.N.Y.1977), at least to the extent that the latter comes from disinterested witnesses. Wright & Miller, *supra* § 2529 at 572–73. *But see Simblest v. Maynard, supra* at 5 n.3. And "[s]ince grant of one of these motions deprives the party of a determination of the facts by a jury, they

should be cautiously and sparingly granted." Wright & Miller, *supra* § 2524 at 542. Suffice it to say that Ternullo does not approach meeting this standard, for there was substantial evidence that plaintiffs' participation in various institutional programs and activities, their access to therapy and their interaction with the rest of the inmate population, all of which Dr. Rundle testified were an important part of treatment, were significantly curtailed by their retention on Ward 3 as census patients. On the basis of this testimony and the testimony of plaintiffs, the jury could have concluded that, overall, plaintiffs suffered a substantial deprivation or major negative change in the conditions of their confinement.

Perhaps recognizing that the jury's factual findings are not vulnerable to attack, Ternullo argues that whether a negative change is sufficiently adverse to constitute a substantial deprivation that would trigger the applicability of due process protections is a question of law for the Court. First of all, as will be explained *infra*, the Court believes that under current due process analysis, the degree of negative change in the conditions of confinement is no longer relevant to whether or not plaintiffs had a due process right to a hearing. However, assuming that it were relevant, the Court believes that whether the conditions on Ward 3 were, overall, relatively worse, better or equivalent to the conditions on Ward 6, was properly a jury question. Moreover, none of the parties, particularly none of the defendants, objected to submitting this question to the jury, and it was the defendants who insisted on going ahead with a jury trial. Be that as it may, the Court believes that whether plaintiffs suffered a "grievous loss," a "substantial deprivation" or a "major change in the conditions of their confinement" may be a mixed question of law and fact. Therefore, the Court will apply the most recent Second Circuit precedent on this question to the jury's finding that conditions on Ward 3 were comparatively worse than on Ward 6.

---

**13.** Although defendants formally request, in the alternative, a new trial, they do not press this point, presumably because their principal grounds for relief are legal, not factual.

In *McKinnon v. Patterson*, 568 F.2d 930 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), plaintiff prisoners complained that they had been confined in "keeplock" for two weeks without being afforded a hearing.

In keeplock plaintiffs were confined to their own cells 23 to 24 hours a day. They were denied contact with other inmates and could not participate in the normal routine of the institution, were not allowed to work at their jobs or earn wages, and had limited access to showers and physical activity.

*Id.* at 932. The Court believed that the issue before it was to "determine where keeplock falls on the [*Wolff v. McDonnell*] spectrum between loss of privileges at one extreme and forfeiture of good time or placement in solitary confinement at the other," *id.* at 936, although it did observe that both the Second Circuit in *Mawhinney v. Henderson*, 542 F.2d 1, 3–4 (2d Cir. 1976), and the Supreme Court in *Baxter v. Palmigiano*, 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), left open the question of whether even loss of privileges would trigger due process, *id.* at 937 n.6.[14] It then went on to hold that even though "[k]eeplock appears to be a milder form of punishment than solitary confinement or confinement in a special housing unit," *id.* at 937, "keeplock is not significantly different from the other forms of punishment which we have held to constitute substantial deprivations. Accordingly, we hold that the imposition of keeplock by the Adjustment Committee must be pursuant to a hearing with minimal due process safeguards." *Id.* at 938.

The similarities between the keeplock involved in *McKinnon* and the retention of the instant plaintiffs on Ward 3 as census patients are readily apparent. Although the instant plaintiffs were not confined to their own cells, in being confined in special housing, "[t]hey were denied contact with other inmates [in the rest of the institution] and could not participate in the normal routine of the institution, were not allowed to work at their [previous institutional] jobs or earn wages, and had limited access to . . . physical activity." *McKinnon, supra* at 932. Moreover, this punishment lasted far longer than the keeplock imposed in *McKinnon*.

Based on *McKinnon*, then, it is clear that as a matter of law the instant plaintiffs suffered a "substantial deprivation" or "major change in the conditions of their confinement" in being retained on Ward 3 as census patients for a period of some months commencing on June 12, 1975.[15]

However, this Court believes that the dictum in *Wolff* regarding "a major change in the conditions of confinement"—a concept which the Courts have struggled to apply—no longer represents the applicable due process analysis. As the Supreme Court stated in *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972), "a weighing process has long been a part of any determination of the *form* of hearing required in particular situations by procedural due process. But, to determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake." (emphasis in original).[16]

Subsequent to *Wolff*, the Supreme Court followed the *Roth* analysis in *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). In holding that due process protections apply to ten-day suspensions of public high school students, the *Goss* Court rejected the school administrators' argument that

---

**14.** The question had been left open in *Wolff* as well, 418 U.S. at 571–72 n.19, 94 S.Ct. 2963. *But see Walker v. Hughes*, 558 F.2d 1247, 1256 (6th Cir. 1977) (dictum that loss of privileges alone would not invoke due process protections).

**15.** Accordingly, assuming that the degree of deprivation suffered were relevant, this Court, too, need not reach the question of whether

loss of privileges alone would trigger due process rights.

**16.** Incidentally, the famous *Wolff* dictum appears in a footnote in the portion of the opinion dealing with how much process is due, rather than whether due process applies at all. *See* 418 U.S. at 563–72, 94 S.Ct. 2963.

even if there is a right to public education protected by the due process clause, the clause would come into play only when the state subjected a student to a "severe detriment or grievous loss," a ten-day suspension purportedly not being severe or grievous. The Court cited its language in *Roth*, that to determine whether due process applies one must look to the nature, not the weight, of an interest, 419 U.S. at 576, 95 S.Ct. 729, and stated further that

> the length and consequent severity of a deprivation, while another factor to weigh in determining the appropriate form of hearing, "is not decisive of the basic right" to a hearing of some kind. *Fuentes v. Shevin,* 407 U.S. 67, 86 [92 S.Ct. 1983, 32 L.Ed.2d 556] (1972). The Court's view has been that as long as a property deprivation is not *de minimus,* its gravity is irrelevant to the question whether account must be taken of the Due Process Clause.

419 U.S. at 576, 95 S.Ct. at 737; *see Meachum v. Fano, supra* (where there is no entitlement, one cannot be created by weighing the degree of deprivation suffered); *accord, Moody v. Daggett, supra* 429 U.S. at 88 n.9, 97 S.Ct. 274; *Walker v. Hughes,* 558 F.2d 1247, 1250–51 (6th Cir. 1977) (threshold question is whether there is a legitimate claim of entitlement, not whether there has been a grievous loss"); *Note, Specifying the Procedures Required By Due Process: Toward Limits on the Use of Interest Balancing,* 88 *Harv.L.Rev.* 1510 (1975).[17] Based on these recent precedents, the Court believes that the real issue is not whether plaintiffs suffered a "grievous loss," as that term was used in the older due process cases, *e. g. Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 25

L.Ed.2d 287 (1970); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), or whether plaintiffs' retention on Ward 3 as census patients constituted a "substantial deprivation" or "major change in conditions of confinement," *see Wolff v. McDonnell, supra,* but whether plaintiffs had an entitlement sufficient to constitute a liberty or property interest and suffered a deprivation thereto which was more than *de minimus. See Goss v. Lopez, supra,* 419 U.S. at 576, 95 S.Ct. 729. The Court holds that plaintiffs did have such an entitlement and suffered such a deprivation.

Turning to the subject of entitlements, first the liberty interest, the Supreme Court " 'has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment].' " *Board of Regents v. Roth, supra,* 408 U.S. at 572, 92 S.Ct. at 2706, *quoting Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). However, "[i]n a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Board of Regents v. Roth, supra,* 408 U.S. at 572, 92 S.Ct. at 2707. *See* L. Tribe, *American Constitutional Law* § 10–8, at 508 (1978) ("the fifth and fourteenth amendments' due process clauses as interpreted in the Supreme Court's substantive due process analyses have furnished a broad definition of . . . 'liberty'.)."

As to the property interest:

> The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already earned in specific benefits. These interests—property interests—may take many forms. . . . To have a property interest in a benefit, a

---

**17.** *But see Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 1560, 47 L.Ed.2d 810 (1976) (implying in dictum that in a case involving only the lesser penalty of loss of privileges the Court would have "to consider the degree of 'liberty' at stake in the loss of privileges and thus whether some sort of procedural safeguards are due when only such 'lesser penalties' are at stake."); *Tracy v. Salamack,* 440 F.Supp. 930, 933 (S.D.N.Y.1977), *modified on*

*other grounds,* 572 F.2d 393 (2d Cir. 1978), *modified on other grounds,* Order on Petition for Rehearing, # 77–2141 (2d Cir. April 26, 1978). ("Two factors govern the determination whether due process calls for a hearing: whether plaintiffs have suffered a 'grievous loss' of a liberty or property interest . . . and whether they have an 'entitlement' to this liberty or property interest arising out of federal or state law or practice.").

person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a *legitimate claim of entitlement* to it. It is the purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—*rules or understandings* that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents v. Roth, supra*, 408 U.S. at 576–77, 92 S.Ct. at 2708–2709 (emphasis added); *accord, Goss v. Lopez, supra*, 419 U.S. at 572–73, 95 S.Ct. 729; *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In *Perry*, which held that a property interest had been created by the State's inducing the plaintiff's reliance on an express or implied promise to renew his contract, the Court stated at 601, 92 S.Ct. at 2699:

We have made clear in *Roth* . . . that "property" interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings." [*Roth* at 577,

[92 S.Ct. 2701.]] A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

Whether it be classified as liberty interest or property interest,[18] this Court believes that by virtue of state law and practice there were "such rules or mutually explicit understandings [to] support [plaintiffs'] claim of entitlement to" psychiatric treatment unimpeded by punitive confinement imposed without due process of law. *See Kesselbrenner v. Anonymous*, 33 N.Y.2d 161, 166–67, 350 N.Y.S.2d 889, 893, 305 N.E.2d 903, 905 (1973), *rev'g*, 39 A.D.2d 410, 417, 334 N.Y.S.2d 738, 745 (2d Dep't 1972) ("By provisions of Constitution and statute . . . the State is responsible for the 'care, treatment, rehabilitation, education, and training of the mentally ill.' "); *Dunleavy v. Wilson*, 397 F.Supp. 670, 671–72 (S.D.N.Y.1975) (Weinfeld, J.) (article 16 of New York Corrections Law requires treatment of prisoners confined in state hospitals operated by Department of Corrections); *Negron v. Preiser, supra*, 382 F.Supp. at 538–39. *See also Cruz v. Ward*, 558 F.2d 658, 661 n.6 (2d Cir. 1977), *cert. denied*, 434 U.S. 1018, 98 S.Ct. 740, 54 L.Ed.2d 765 (1978) (left open questions of whether New York law afforded inmates at Matteawan a liberty interest in receiving adequate psychiatric care, or in the alternative, whether such a liberty interest could be triggered by a prisoner's eighth amendment entitlement to adequate medical care).[19]

---

**18.** *Walker v. Hughes, supra*, construed *Meachum, supra*, as equating the test for liberty with the test for property, and therefore the *Walker* court concluded that liberty interests can be created by "rules or mutually explicit understandings." 558 F.2d at 1255 (*quoting Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)).

**19.** In addition, plaintiffs have an interest in not being wrongfully detained in disciplinary confinement, *McKinnon v. Patterson, supra*, 568 F.2d at 939–40, and in not being arbitrarily denied treatment made available to those similarly situated. *Cf. Liles v. Ward*, 424 F.Supp.

675, 679 (S.D.N.Y.1976). Furthermore, the State has an interest in promoting treatment and in not erroneously punishing inmates and thereby inhibiting treatment. *See Goss v. Lopez, supra*, 419 U.S. at 579, 95 S.Ct. 729 (State has interest in not erroneously suspending students); *Morrissey v. Brewer, supra*, 408 U.S. at 484, 92 S.Ct. 2593 (State has interest, *inter alia*, in restoring parolee to useful life and therefore an interest in not revoking parole because of erroneous information, or because of an erroneous evaluation of the need to revoke, given an actual breach of parole conditions. State interest is not advanced by revoking parole without procedural protections).

■ Although it is true that Matteawan officials were vested with wide discretion for determining how to provide psychiatric services and maintain order, that discretion was not so limitless that this Court could accept Ternullo's argument that "[n]o statute, regulation, official policy or practice created a right for a patient to participate in a particular program or service, *or any at all*." Defendants Pre-Trial Memorandum of Law at 16 (emphasis added). The very reason for which plaintiffs were committed to Matteawan was to be treated. Thus, New York State law and policy regarding confinement at Matteawan, combined with formal commitment proceedings, created a "reasonable expectation," *see Tracy v. Salamack*, 440 F.Supp. 930, 934–36 (S.D.N.Y. 1977), *modified on other grounds*, 572 F.2d 393 (2d Cir. 1978), *modified on other grounds*, Order on Petition for Rehearing, # 77–2141 (2d Cir. April 26, 1978), or a "justifiable expectation," *see Zurak v. Regan*, 550 F.2d 86, 92 (2d Cir.), *cert. denied*, 433 U.S. 914, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977), *quoting Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), which cannot be dismissed by cavalierly asserting that "[a] patient's programs can be changed or eliminated for any number of reasons," Defendant's Pre-Trial Memorandum of Law at 16, especially where the jury found that plaintiffs' programs had been eliminated for purely punitive reasons. Therefore, the Court holds that although the Matteawan officials did

have wide discretion in transferring prisoners from ward to ward and developing and changing programs, this discretion was circumscribed by the duty to provide, and plaintiffs' legitimate claim of entitlement to receive, treatment. Accordingly, this is not a case where there is no entitlement due to the existence of unlimited discretion under state law. *Meachum v. Fano, supra,* and *Moody v. Daggett, supra,* therefore are distinguishable.[20] Consequently, the Court holds that plaintiffs suffered a deprivation of an entitlement which triggered the applicability of *Wolff* and the due process protections mandated therein.[21]

2. *Because the Jury Found that Plaintiffs Were Retained on Ward 3 Solely for Punitive or Disciplinary Reasons, the Court Need Not Decide Whether Due Process Protections Should be Applicable to Modifications in the Conditions of Confinement for Purposes of Treatment.*

The defendants argued at the preliminary injunction stage that due process protections should not apply to use of restraint (*i. e.* strait jacket) and seclusion at Matteawan because Matteawan was purportedly a treatment institution and changes in confinement purportedly were made for medical reasons. The Court deferred definitively ruling on this novel question pending further development of the facts.

---

20. *See Zurak v. Regan, supra,* 550 F.2d at 92 (*quoting Montanye, supra,* 427 U.S. at 242, 96 S.Ct. 2543) (although recognizing that conditional release was, by statute, in the discretion of the Parole Board, held that statute nonetheless provided inmates with a "justifiable expectation rooted in state law"); *Tracy v. Salamack, supra,* 440 F.Supp. at 934–36 (even though state statute governing temporary release program and form agreement signed by participating prisoners stated that participation in program is privileged and can be revoked at any time, based on a "more natural" reading of the agreement and prior practice, plaintiff prisoners had a "reasonable expectation" that removal from the program would not be discretionary, but would be based only on a violation of specific provisions).

21. Ternullo argues that due process protections must always apply or never apply. Since ward transfers and changes in programs were not always for punitive reasons, and therefore due process would not always apply, Ternullo argues that due process cannot apply in this case even though the jury found that the transfer and reclassification constituted a major negative change in the conditions of confinement imposed for punitive reasons. The Court does not accept the basic premise that due process is an all or nothing proposition. Cases must turn on their own facts. *See, e. g., Taylor v. Clement,* 433 F.Supp. 585 (S.D.N.Y.1977) (found on facts of that case that "protective custody" was in fact punitive confinement and therefore subject to due process protections; did not adjudicate use of protective custody generally).

Although the use of restraint and seclusion is not involved in the portion of the verdict challenged by this motion, the argument that due process should not apply in a treatment setting is again advanced. Ternullo relies on language in *Cruz v. Ward, supra,* 558 F.2d at 662, and *Board of Curators v. Horowitz,* 435 U.S. 78, 89–90, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (no hearing required to discharge medical student because educational process is not adversarial), as support for the contention that adjudicatory fact-finding procedures should not apply to what he characterizes as subjective, evaluative, discretionary judgments.

■ It is unnecessary to dispose of this argument because now that the facts have been developed and the jury has found that what was involved was not discretionary treatment decisions being made by psychiatrists or ward teams, but punitive confinement imposed by the Matteawan administration, Ternullo lacks the factual underpinning to make this legal argument. For the same reason, *Cruz v. Ward, supra,* which held that due process was not denied in transferring prisoners out of Matteawan without a hearing, is distinguishable insofar as it was predicated on a finding that the transfers out of Matteawan were based on medical findings of two doctors and were not for punitive reasons.[22]

3. *Because Plaintiffs Were Retained on Ward 3 for Punitive Reasons, Rendering Wolff v. McDonnell Applicable, There was a Hearing Requirement in 1975. Therefore, the Court is not Creating Retroactive Liability for Damages.*

■ "It is by now hornbook law that a prisoner may not be subjected to punitive segregation without at least a modicum of due process. *Wolff v. McDonnell* [418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)] . . . [P]rison officials cannot avoid their due process responsibilities simply by relabelling the punishments imposed on

prisoners within their charge." *Taylor v. Clement,* 433 F.Supp. 585, 587–88 (S.D.N.Y. 1977). Ternullo should have been aware of this, in view of "the guiding light of *Wolff v. McDonnell." McKinnon v. Patterson, supra,* 568 F.2d at 935. Thus, this Court is not subjecting Ternullo to a newly created and retroactively imposed liability.

4. *Because Wolff v. McDonnell was Clearly Applicable to Punitive Confinement Imposed in 1975, Ternullo Does Not Meet the Objective Test of Good Faith. Moreover, the Jury Found He Did Not Act in Subjective Good Faith. Therefore, Ternullo Did Not Prove the Defense of Good Faith Immunity.*

Based on the Supreme Court decisions of *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the jury was charged in part:

Good faith must be judged both by a subjective standard of what the particular defendant you are considering actually believed, and by an objective standard of whether that belief was reasonable.

Subjective good faith means that the defendant acted sincerely and with a belief that he was doing right.

Objective good faith means that an act violating an inmate's constitutional rights can be no more justified by ignorance or disregard of settled indisputable law on the part of one entrusted with supervision of the inmates' daily lives than by the presence of actual malice. Thus, defendants must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic unquestioned constitutional rights of the persons in their charge.

The question, then, is whether a defendant knew or reasonably should have known that the action he took within his

---

**22.** Moreover, *Cruz* did not hold that due process did not apply; it left open the question of whether or not there was an entitlement to

trigger due process rights, and instead went off on a holding that the procedure followed did not deny plaintiffs due process.

sphere of official responsibility would violate the constitutional rights of a plaintiff, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to a plaintiff.

.        .        .        .        .

In making the determination on the matter of good faith, you should take into account the scope of discretion and responsibilities of each defendant and all the circumstances as they reasonably appeared at the time of the events of which the plaintiffs complain.

The Court told the jury that whether defendants were required to afford plaintiffs a hearing was a question of law which the Court would decide after they returned a verdict.[23] Because the jury did not know whether there was a hearing requirement of which Ternullo was or should have been aware, they could not determine whether Ternullo met the objective test of good faith laid down in the above cases. The

Court will resolve the issue of objective good faith momentarily.

■ The jury was in a position, however, to determine Ternullo's subjective good faith—whether he acted sincerely and with a belief that he was doing right. Their finding that he did not act in good faith is supported by the evidence underlying their finding that Ternullo was personally responsible for plaintiffs' being retained on Ward 3 as punishment, not treatment, for an incident which the jury apparently blamed partially on Negron (i. e., finding that McCall's use of unjustified or excessive force against Negron had been a good faith response to the situation implies that Negron was assaultive) and partially on the corrections officers (i. e., finding that plaintiffs would not have been retained on Ward 3 as census patients had they been given a hearing implies that they would have been exonerated at a hearing).[24]

Because Ternullo had the burden of establishing both subjective and objective

---

**23.** There were two reasons why the Court did not charge the jury on whether or not a hearing was required. First, the Court believed that the law might vary depending on whether or not the jury were to find that plaintiffs' confinement as census patients was solely for punitive reasons. The Court believed it preferable to allow the jury to make their findings purely on the facts rather than to juggle with applying two versions of the law. Second, if the jury found that the confinement was not solely for punitive reasons, then the law would not only vary, but would probably be novel. Rather than give the jury novel and possibly incorrect law to apply and risk infecting the verdict on this and possibly other related findings, the Court decided to segregate this issue of law from the rest of the case and decide it post-trial. None of the parties objected to this procedure.

**24.** A hearing would have served two functions: first, to determine whether each of the plaintiffs committed assaultive acts and, second, assuming plaintiffs did commit such acts, to decide what punishment, if any, should be imposed. The first function is to adjudicate pure facts, the second to exercise discretion informed by the facts found. *Morrissey v. Brewer, supra,* 408 U.S. at 479–80, 92 S.Ct. 2593; *accord, Codd v. Velger,* 429 U.S. 624, 627–28, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *see Goss v. Lopez, supra,* 419 U.S. at 580, 95 S.Ct. 729. *See also McKinnon v. Patterson, supra,* 568

F.2d at 939 n.9 (imposed hearing requirement on the Adjustment Committee even though the Adjustment Committee, as distinct from the Superintendent's Proceeding, functioned in a flexible and counseling capacity, rather than a disciplinary or punitive capacity).

Although the jury was not charged that a hearing would have had both adjudicatory and discretionary aspects, common sense experience would suggest that the procedure would take such a form. Based on such an assumption and an assumption that a hearing officer would have found the facts to be as the jury apparently found them, the jury evidently concluded, based on the following fact findings and reasoning, that a hearing would have exonerated plaintiffs: the jury could have found, and expected a hearing to disclose, that although McCall acted in good faith, his use of excessive or unjustified force was imprudent and contributed to the escalation of the disruption, which was further enflamed when the additional corrections officers responding to the alarm arrived and immediately and erroneously assumed that they were perceiving an emergency for which they had been summoned. On the basis of such an assessment, the jury could have found, and expected a hearing officer to conclude, that the Ward 6 incident arose out of misunderstanding and apprehensions for which neither McCall nor plaintiffs should have been blamed.

good faith and because the jury's finding that Ternullo did not act in subjective good faith is supported by the evidence, the jury's finding in itself is dispositive of the good faith defense.

■ In addition, because *Wolff v. McDonnell,* of which Ternullo was on notice, clearly established the right to a hearing prior to imposition of what the jury found to be punitive confinement constituting a major negative change in the condi-

tions of confinement,[25] and because a state-created right to treatment was clearly established prior to the acts complained of, see *Kessenbrenner, supra; Dunleavy, supra; Negron, supra,* the Court joins in plaintiffs' assertion that "[i]n view of . . . the obvious purpose of commitment to a psychiatric hospital such as Matteawan, it cannot be credibly claimed that [Ternullo] reasonably believed that [he was] acting lawfully in interfering with the plaintiffs' participation in the course of treatment at Matteaw-

25. Ternullo argues that he acted in the good faith reasonable belief that his conduct was legal insofar as he relied on 7 N.Y.C.R.R. § 250.1(b), which purportedly forbade the use of hearings in psychiatric prisons. Because the Supreme Court's dictates in *Wolff* are mandatory and, under the Supremacy Clause, would take precedence over conflicting state administrative regulations, an administrator relying on such a regulation would not be acting in the good faith, reasonable belief that he was acting legally. Moreover, there was not even such a conflicting regulation in this case, for 7 N.Y.C.R.R. § 250.1(b) did not forbid the use of hearings in psychiatric prisons; it merely did not require them. A fortiori, it would not have been reasonable for Ternullo to have chosen to rely on that regulation instead of following *Wolff.*

The Court also regards as a red herring Ternullo's argument that because the Court did not issue a mandatory preliminary injunction requiring a hearing prior to *medical use of seclusion or restraint (i. e., use of a strait jacket) as treatment,* he reasonably believed that a hearing was not required before imposing *punitive confinement interfering with treatment.* That it would be unreasonable to rely on this Court's reasoning with regard to a form of purported medical treatment, entirely distinct from the punishment involved in the challenged verdict, is obvious. Furthermore, even with respect to the use of seclusion as treatment, although the Court did not *preliminarily* enjoin its use, it hardly sanctioned it. The Court stated:

> That placing a person in an isolation cell is a serious step has been recognized by the courts for some time. . . . [U]se of this serious sanction is surrounded by due process safeguards. . . .
>
> Use of seclusion as a "treatment" is . . no less serious a step.
>
> . . . . .
>
> . . . [U]se of seclusion is a drastic measure, rightly perceived by the inmates as a substantial loss of liberty. Also, it is apparent to the Court that at Matteawan the cells are at least on some occasions used for the purpose of maintaining order, not simply treating agitation. While this is certainly a

legitimate consideration, in a purely prison setting comparable use of isolation for the comparable purpose of maintaining prison discipline and promoting the safety of the occupants, is surrounded with strict procedural safeguards, and cannot go beyond the limits of "cruel or unusual" punishment. Persons in a treatment setting are entitled to no less.

*Negron v. Preiser, supra,* 382 F.Supp. at 541–42. The Court found at that time that

> [i]n theory, [the] formal decision by a highly educated professional, that the symptom or condition exists, that this treatment is indicated and is not disproportionate to the "symptom," and that the treatment will not continue beyond the time it is indicated, accomplishes the function of protecting the patient from an arbitrary deprivation of a right or privilege which in a prison is accomplished by a form of due process hearing.
>
> However, after hearing all the testimony in two days of hearings, the Court concludes that these safeguards are, in practice, somewhat illusory. The hospital records do not reflect any of the bases upon which the decision to select this treatment rests, nor do they indicate the degree of medical supervision which the hospital rules require, which the doctor testified exists, and which the prisoners themselves deny receiving.

*Id.* at 542. Accordingly, the Court ordered that extensive records be kept of each use of an isolation cell to ensure that the decision to seclude a patient "is based on explicit criteria, is reviewed at the requisite brief intervals, and is, where possible, supplemented by other forms of treatment." *Id.* at 543. However, the Court concluded that it had not yet heard sufficient testimony as to the supposed medical justification for the absence of regulations governing patient behavior and the imposition of sanctions therefor. Consequently, pending proof at trial of the purported use of seclusion as treatment, the Court declined to order promulgation of rules governing patient behavior and sanctions, and declined to order that a due process type of hearing accompany the use of seclusion. *Id.* at 543.

an." Plaintiffs' Pre-Trial Memorandum of Law at 15. Thus, as a matter of law, Ternullo also did not act in objective good faith. For this reason, too, Ternullo did not establish the good faith immunity defense.

For the foregoing reasons, Ternullo's motion for judgment notwithstanding the verdict or a new trial is denied.

It is so ordered.